STATE OF NEBRASKA, APPELLEE, v. ALONZO JACKSON KIMBROUGH, APPELLANT.

115 N. W. 2d 422

Filed June 1, 1962. No. 35216.

*Thomas P. Lott,* for appellant.

*Clarence A. H. Meyer,* Attorney General, *Dwain L. Jones,* and *Melvin K. Kammerlohr,* for appellee.

Heard before SIMMONS, C. J., MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ., and CHADDERDON, District Judge.

SPENCER, J.

Defendant, Alonzo Jackson Kimbrough, was found guilty by a jury of the crime of manslaughter, and was sentenced to a term of 7 years in the Nebraska State Penitentiary. Defendant appeals to this court.

There are two assignments of error. First, that the trial court committed reversible error by submitting a charge of manslaughter to the jury after the defendant had moved for a directed verdict, and second, that the trial court committed prejudicial error by refusing to admit evidence of the violent, desperate, and dangerous character of the deceased.

Defendant, by his own admission, shot Charles Johnson in the City of Omaha, August 19, 1961. Charles Johnson was pronounced dead on arrival at the county

hospital, and will hereinafter be referred to as the deceased. The shooting took place after a dice game behind the People's Hotel at Twenty-sixth and Q Streets. An argument developed between the defendant and the deceased over a quarter bet in the dice game. There is testimony that the deceased, who had a pair of shoes and a small knife on the ground beside him, started for the defendant. The defendant went behind two of the other players. One of these players gave the defendant the 25 cents to settle the argument, and the defendant left the game and went to his room in the hotel.

Defendant testified: "Q. Did you say anything to him? A. I told him I won the bet. Q. What did he say? A. He told me, 'You ain't won this bet.' I said, 'You are taking the quarter?' and he said, 'If that is what you want to call it, you can say that.' Q. What? A. 'If that is what you want to say, you can call it that.' Q. Then what happened? A. I said, 'You don't take nothing from me, Charles; you know I won that bet. You are wrong.' I said, 'You draw your quarter and I draw mine, that is off the bar.' He stuck his hand in his coat pocket and pulled a knife, and then I walked behind Robert Welch. I walked away from him because he had his back against the building, and I walked around behind Pete Roach and Robert Welch. Q. Did Robert Welch give you a quarter? A. Yes, he did. Q. You took the quarter? A. Yes, I did. Q. Then what did you do? A. Well, Johnson and I kept exchanging words and so I went upstairs." Another witness testified the deceased was not armed in any manner at this time.

Some testimony indicates defendant soon returned with a gun in his hand. He pointed the gun at the deceased and said, " 'If you don't get my quarter, I will get you or kill you.' " Deceased asked him, " 'What are you doing, threatening my life?' " Defendant replied, " 'You take it any way you want to.' " Defendant testified he told deceased, " 'You don't take nothing from

me,' " and that when deceased started for him, he pulled the gun out of his pocket, and the deceased stopped. He testified deceased then told him he had better keep the gun on him at all times. Defendant then left and the dice game continued for about 30 minutes.

The testimony indicates that sometime before the end of the game the defendant returned with the gun in his hand and without comment went through an alleyway to the front of the hotel. After the game broke up the deceased went through the hotel and left by the front door. The defendant testifies that he was standing by the side of the door and that as the deceased came out, deceased sprang at him, striking him with the shoes and swinging at him with a knife; that he was knocked against the building and then knocked down; that he managed to knock the deceased off balance; and that as he tried to get up, he drew his gun from his pocket and fired once, but deceased still came forward so he fired again, hitting him in the chest, and deceased fell to the sidewalk.

None of the witnesses saw the knife after the shooting and no mention of it was made by the parties at the scene. No knife was found near the body or in the hands of the deceased. When a knife was mentioned at the police station, an officer returned to the scene but none could be found. However, a knife was given to this officer by one Markus Eldridge who told the officer he picked it up on the walk. There was no testimony as to whether this knife was closed or open at that time. None of the witnesses saw Eldridge at the scene during or immediately after the shooting, and he was not produced as a witness.

Manslaughter is defined in section 28-403, R. R. S. 1943, as: "Whoever shall unlawfully kill another without malice, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of some unlawful act, shall be deemed guilty of manslaughter; and upon conviction thereof shall be imprisoned in the

penitentiary not more than ten years nor less than one year."

Defendant moved for a directed verdict at the close of the State's evidence. This was overruled. He then presented evidence which did not refute the State's case but sought to excuse the act as being necessary for his own defense. This waived any claim of error in the ruling on his motion at that stage. We said in Henggler v. State, *ante* p. 171, 112 N. W. 2d 762: "Where a motion for a directed verdict is made at the close of the evidence of the State in a criminal action, the introduction of evidence thereafter by the defendant waives any error in the ruling on the motion. The defendant, however, is not prevented from questioning the sufficiency of the evidence in the entire record to sustain a conviction." The sufficiency of the evidence was raised by the renewal of the motion at the close of all of the evidence.

Is the evidence sufficient to sustain a conviction for manslaughter? We find that it is. We said in Spreitzer v. State, 155 Neb. 70, 50 N. W. 2d 516: "In a criminal case, this court will not interfere with a verdict of guilty based upon the evidence, unless it is so lacking in probative force that we can say, as a matter of law, that it is insufficient to support a finding of guilt beyond a reasonable doubt."

There are variances in the testimony of the witnesses. Just to mention a few: Defendant claims to have been cut with a knife. No one noticed any knife cuts on him. Defendant claims that he fired the second shot as he was coming off the ground. Another witness testified that there was only one shot and that the defendant was standing when it was fired. The physician who examined the body said the bullet's path in the body was fairly straight.

It is not the province of this court to resolve conflicts in the evidence in law actions, to pass on credibility of witnesses, to determine the plausibility of explanations,

or to weigh the evidence. These matters are for the jury. Haines v. State, 170 Neb. 304, 102 N. W. 2d 609.

As we view the record, there was ample competent evidence to permit the jury to find the defendant guilty of manslaughter. Defendant's defense of justification or self-defense was submitted to the jury by an instruction of which the defendant does not complain. The question whether there existed in the mind of the defendant an apprehension based upon reasonable grounds therefor of imminent peril to life or limb through the assault of the deceased, and also whether the means adopted for his defense were reasonable and appropriate for that purpose, in view of all the circumstances surrounding him at the time of the fatal shot, is essentially a question of fact of which the jurors are the sole judges. See Housh v. State, 43 Neb. 163, 61 N. W. 571.

Defendant urges that the trial court committed prejudicial error by refusing to admit evidence of the deceased's violent disposition and dangerous character. Even if it were properly before the court, there is no merit to defendant's claim. Defendant produced a police officer who was employed in the records bureau of the police department. This officer had with him a folder which bore the name of Charles Johnson. He did not know Charles Johnson. He did not know how many Charles Johnsons lived in Omaha. The record was not connected in any way with the deceased. An objection to further testimony was sustained. The record is not before the court, and no offer of proof was made.

The defendant was permitted to testify as follows: "Q. (By Mr. Lott) Did you know that Charles Johnson had been in jail for fighting? A. Yes, I did. Q. Were you afraid of Charles Johnson? A. Well, in a way I was. I knew he was supposed to be a sort of treacherous type of person. Q. How did you know this? A. By a boy that I knew; he cut down the side of his face with a knife. MR. LOTT: That is all." On cross-examination he testified as follows: "Q. On cross-examina-

tion I asked you if Charles Johnson was all right with you as far as you were concerned; do you remember that? A. Yes. Q. And you said what? A. Yes. Q. Now you say that you were afraid of him; is that it? A. Well, he never did anything to me. Q. So you had no cause to be afraid of him, did you? A. Just that I heard that he was a treacherous type of person. Q. This is from some fellow whose name is what? A. What I have heard about him and the fellow that he cut * * *." Later on cross-examination, he was asked the following question as to the deceased: "Q. Is that this vicious character that you are talking about? A. I didn't say he was a vicious character. I won't state that fact that he is a vicious character."

In Carleton v. State, 43 Neb. 373, 61 N. W. 699, we said: "In a prosecution for homicide it is admissible for the defendant, having first established that he was assailed by the deceased and in apparent danger, to prove that the deceased was a person of ferocity and violent disposition, and this for the purpose of showing either that the defendant was acting in terror and hence incapable of that specific malice necessary to constitute murder in the first degree, or that he was in such apparent extremity as to make out a case of self-defense, or that the deceased's purpose in encountering the defendant was deadly." However, in that same case we also said: "Such proof must be made by evidence of the general reputation of the deceased. It cannot be made by proving either specific acts on his part or the opinions of witnesses as to his disposition based on their own observations."

For the reasons given above, the verdict of the jury and the judgment rendered thereon should be affirmed.

AFFIRMED.