355 A.2d 722.

STATE *vs.* JOHN A. INFANTOLINO.

APRIL 23, 1976.

PRESENT: Paolino, Acting C. J., Joslin, Kelleher and Doris, JJ.

KELLEHER, J. "Jekyll & Hydes" was the name of a downtown Providence nightclub whose front entrance looks out on the southeast corner of Pine and Orange Streets. Some of the patrons present during the early morning hours of Sunday, April 14, 1974, witnessed an extraordinary sequence of events transpire: a fight between two men at the bar, the shooting of one by the

other outside the premises shortly thereafter, and, finally, a police chase culminating in the apprehension of the assailant.

The defendant, John A. Infantolino, was the pugilist-assailant. Donald Neves, the pugilist-victim, died some 7 hours later from massive abdominal hemorrhaging caused by a gunshot wound. Following this incident, defendant was indicted on three counts: murder, carrying a pistol without a license, and committing a crime of violence while armed. The violent crime count was dismissed prior to trial. Thereafter, defendant was tried before a Superior Court jury on the remaining counts. The jury found defendant guilty of committing second degree murder and carrying a pistol without a license. The defendant appeals.

On Saturday, April 13, 1974, Neves and his friend, William Mammone, went to Jekyll & Hydes to celebrate Neve's change of jobs. Neves, formerly employed as a house painter, had just attained a position as a "consultant" at a local health spa. He and Mammone arrived at the nightclub sometime near 10:30 p.m. They had a beer and adjourned to the game room, where Neves watched Mammone play pool. Subsequently, they returned to the bar, each taking a seat adjacent to Doris Bajakian. Doris' sister, Diane, who was working at the club as a waitress, was Infantolino's girlfriend. Shortly after midnight defendant entered, took Doris' seat, and she sat on his lap. Diane, meanwhile, was seated at a table to the rear of the three chairs. The defendant was engaged in a many-sided conversation which involved both sisters and, at one point or other, Neves and Mammone.

Things remained on the congenial side until just before closing time (2 a.m.) when Neves apparently said something offensive to defendant. Infantolino, in response, hit Neves with a right-hand punch that sent him sprawling

to the floor. A wrestling match ensued, and the club bouncers moved in and separated the combatants. The scuffling was stopped within a few minutes. Neves and Mammone were asked to leave the premises by the front door. Infantolino, a regular customer, was escorted to the Orange Street side exit, where one of the bouncers talked to him. As soon as Infantolino appeared to have regained his composure, the bouncer told him to leave the premises by the side exit.

Neves and Mammone were concerned about the possibility of the renewal of the fisticuffs once they left the club so they asked Infantolino's girlfriend to accompany them as they made their way to the street. Neves, the first one down the front stairs, was standing on the Pine Street sidewalk waiting for Mammone and Diane to join him when Infantolino came around the corner from the Orange Street exit. Mammone testified that he was standing on the front steps when defendant asked, "Where is he?" and Mammone pointed to the bottom of the stairs and said, "There he is." According to Mammone, Infantolino walked toward Neves, who immediately assumed the stance of a boxer. Infantolino, however, apparently unconcerned with the Marquis of Queensberry's Rules, pulled a .22-caliber pistol from his waistband and shot Neves twice. Neves stumbled and ran down Pine Street one block, turned right onto Peck Street, and continued for some 50 feet before collapsing onto the sidewalk. Infantolino and Mammone ran down the street after him.

Two police officers cruising in the vicinity heard the shots and arrived at the victim's side in a matter of seconds. Officer Leonard Wahl told the jury that he ran down Peck Street and chased defendant up Pine Street around the club's front entrance toward the Orange Street exit. When he caught up with Infantolino, defendant turned and pointed his pistol at him. Officer Wahl in turn

drew his pistol and told him to "drop it." Infantolino wisely obliged.

Neves was taken to Rhode Island Hospital, where emergency surgery proved unsuccessful. The medical examiner who performed an autopsy on Neves testified that the entry point of both bullets indicated that he was turning toward his right at the time he was shot. No one who testified denied that defendant struck the first blow or that he shot and killed Neves. However, when defendant pleaded to the indictment, he specifically pleaded not guilty to the murder charge, alleging that the killing occurred as he was attempting to defend himself.

The first facet of defendant's appeal concerns the trial justice's refusal to charge the jury regarding its right to return a verdict of manslaughter. A charge to the jury should be confined to propositions of law related to material issues of fact which the evidence tends to support. The jury's attention should not be directed to various propositions of law unless the record contains evidence which supports and requires it. *State* v. *Crough,* 89 R. I. 338, 352, 152 A.2d 644, 652 (1959); *State* v. *Shea,* 77 R. I. 373, 376, 75 A.2d 294, 296 (1950). The defendant sought an instruction on the issue of voluntary manslaughter — a type of homicide which we have defined as a death occurring during the heat of the defendant's passion, which in turn had been caused by the deceased's reasonable provocation. *State* v. *Winston,* 105 R. I. 447, 453, 252 A.2d 354, 358 (1969).

Here there is no evidence that when Infantolino left by the side exit and made his way over to Pine Street, he was seething with uncontrollable rage, anger, and resentment because of some action taken by the deceased during their bar-side confrontation. Three defense witnesses testified that anywhere from 5 to 15 minutes had elapsed between the brief scuffle and defendant's rear-

exit departure. Two of the witnesses said that when Infantolino left the premises, he did not appear to be upset, while a third witness described the exiting defendant as being "very angry" and "very nervous." However, this witness made it clear that Infantolino's distress was not attributable to the deceased's conduct, but rather he described defendant as being "plexed" or feeling "very insecure" because of the way the club's manager, a long-time friend of Infantolino's, had berated defendant in front of the customers. The defendant himself refuted any suggestion that he was relying on the heat-of-passion theory when during his direct testimony he stated that when he took his leave of the bouncers at Jekyll & Hydes, he was not "mad." In fact, Infantolino made it quite clear that he drew his weapon only after he allegedly saw Neves standing on the Pine Street sidewalk pointing a gun at him. He also stated that he had fired the two shots to "protect himself." Infantolino's entire trial strategy was geared to the doctrine of self-defense. The defendant insisted that immediately after the fisticuffs Neves had threatened to kill him and when he encountered the deceased on the sidewalk, Neves was pointing a gun at him. Diane testified that she also saw the deceased point a "square object" at her boyfriend and that it appeared to be a gun.

There is not one shred of evidence that would warrant a charge of voluntary manslaughter. The choice presented to the jury by the testimony was quite simple. They could have either believed Mammone's story depicting Neves posed empty handed in a boxer's stance or defendant and Diane's version describing Infantolino's need and effort to protect his life. We note that although defendant insisted he had the pistol tucked in his waistband through-

out his stay in the club,[1] Doris testified that she never felt anything while sitting on his lap. The trial justice's refusal to charge on the manslaughter theory was correct.

The trial presently under review began on January 20, 1975. The jury was empaneled and the state's testimony began on that date. On January 21 Mammone finished his testimony, and Officer Wahl was called. After describing his gunpoint arrest of defendant, the trial justice adjourned the court for the usual midmorning recess. After the recess but before the jury returned to the courtroom, the defense moved to suppress the officer's "anticipated testimony." The defendant's attorney explained that when the officer would resume his direct testimony, he would tell the jury that immediately following the arrest Infantolino told him that on a previous occasion Neves had shot him. The trial justice denied the motion. When the officer returned to the stand, he did indeed testify that once he took defendant into custody, Infantolino complained to him that sometime in 1973 Neves had shot him.

In arguing the motion to suppress, defense counsel claimed that the probative value of this statement was outweighed by the unduly prejudicial effect it would have on Infantolino's cause. The trial justice, in denying the motion, invoked the doctrine of the "law of the case" because the arrest-site admission was the subject of an earlier motion to suppress which had been denied. The trial jus-

---

[1] The defense presented testimony which showed that Infantolino had arrived at the nightclub sometime near midnight in the company of Charles L. Digby, Jr., and James R. Bogle. The trio was using Bogle's automobile. When Bogle parked his car in a nearby parking lot, Infantolino's loaded pistol was under the front seat. Sometime during the evening's festivities, Digby became ill. It was decided that Bogle would drive Digby home and Infantolino would obtain transportation from one of his friends. At approximately 1:30 a.m. on Sunday, April 14, 1974, defendant went to Bogle's car, picked up his weapon, and returned to the nightclub.

tice's reference to the earlier motion to suppress caused us to look at the docket sheet. Since defendant's argument, on appeal, challenging the trial justice's denial is based on what transpired at those proceedings, a brief summation is warranted.

Prior to his appearance for trial in December of 1974, defendant filed a motion to suppress which claimed that this arrest-site conversation violated his *Miranda* rights and was inadmissible because of its potential prejudicial effect. The trial justice reserved decision on the motion, and the case opened after a not guilty plea. The remainder of the day was spent in jury selection. On the following morning the trial justice denied the motion to suppress, and the prosecution opened its case by presenting Mr. Mammone as its first witness. However, later that day a motion to pass the case was presented and granted by the trial justice because one of the sisters, Doris or Diane, was the girlfriend of a juror's niece's husband. Accordingly, the case was reassigned for a new trial. The defendant asserts that the granting of this motion to pass washed out any ruling on the motion to suppress. We do not agree.

The motion to pass did nothing more than wipe the slate clean with respect to the presentation of evidence on the issue of defendant's guilt or innocence; it did not eradicate the denial of his motion to suppress. The "law of the case" principle states that ordinarily after a judge has decided an interlocutory matter in a pending suit, a second judge, confronted at a subsequent phase of the suit with the same question in the identical manner, should refrain from disturbing the first ruling. *Rhode Island Opthalmological Soc'y* v. *Cannon,* 113 R. I. 16, 20, 317 A.2d 124, 126-27 (1974); *Goldstein* v. *Rhode Island Hosp. Trust Nat'l Bank,* 110 R. I. 580, 588, 296 A.2d 112, 116 (1972). We think the "law of the case" principle barred the grant-

ing of the second motion. If, after the initial denial, defendant had introduced material which significantly extended the record, then the second motion could have been entertained. *Goldstein* v. *Rhode Island Hosp. Trust Nat'l Bank, supra* at 588, 296 A.2d at 116. However, defendant's second effort was merely a repeat of his earlier attempt. In both instances he claimed that the prejudice outweighed the relevancy of the officer's testimony.

Although we base the denial of the second motion on defendant's failure to extend the record, we note that any relevant evidence introduced at trial by the prosecution unquestionably "prejudices" a defendant's case. That is the purpose of our adversary system. What is not to be countenanced is the receipt of relevant evidence whose probative value is completely obliterated by its probable improper prejudicial impact. The key phrase is "improper prejudicial impact."

The officer's repetition of defendant's arrest-site remark was clearly relevant on the issue of premeditation. *If* it was accepted by the jury, it quite properly "prejudiced" defendant's case.[2] We find no improper prejudicial impact from the jury's listening to this testimony.

There is a third ground for denying defendant's motion. On February 13, 1973, we ruled that any effort to suppress evidence in a criminal proceeding subsequent to that date must be by a motion made and heard prior to trial. *State*

---

[2]The commanding officer of the Providence Police Department Detective Division appeared as a defense witness. He had examined the arrest report prepared by Officer Wahl and told the jury that the report contained no reference to Infantolino's complaint that he had been shot a year ago. When Infantolino took the stand, he stated that at 2 a.m. on December 18, 1972, he was shot while he was escorting his girlfriend, Phyllis, into the apartment building where he lived. He admitted that he did not know who shot him, and he conceded that the first time he met the deceased was a year and a half later, when they met on that fateful Sunday morning at Jekyll & Hydes.

v. *Maloney,* 111 R. I. 133, 144, 300 A.2d 259, 265 (1973). As noted earlier, the second motion to suppress[3] was presented in the midst of the state's presentation of its case and is in direct violation of the *Maloney* rule.

The defendant next contends that the trial justice erred by ruling that the .22-caliber pistol could be introduced into evidence as a full exhibit. This contention is based on defendant's assertion that the prosecution failed to establish the requisite chain of custody. Officer Wahl identified the exhibit as the pistol dropped by defendant. The exhibit bears a tag which reads: "At 2:15 a.m. on this date of 4/14/74 I took this .22-caliber revolver from one, Infantolino, John A., on Orange Street." Following this quote appears a signature which the officer identified as his. On cross-examination the officer pointed out that he had marked the gun by scraping his initials on the left rear portion of the weapon just above the pistol grip. An examination of the weapon shows the presence of these initials.

In *State* v. *McCartin,* 106 R. I. 674, 680, 262 A.2d 826, 830 (1970), we remarked that a showing of a continuous chain of possession is a more effective guarantee of the reliability of an exhibit than a reliance upon identifying marks or labels usually found on an exhibit. However, we did not mean that an exhibit such as a murder weapon could be introduced into evidence only upon the showing of a continuous chain of custody. What must be shown is the reasonable probability that no one has tampered with the exhibit. In this case there is not the slightest hint that someone tampered with the pistol. In fact, at two different points in his testimony, defendant identified the exhibit as his gun.

---

[3]In considering this facet of Infantolino's appeal. we are assuming that the trial counsel's premonition of the prejudicial impact of the arresting officer's future testimony was a proper subject for a suppression hearing.

The final portion of this appeal concerns the trial justice's denial of defendant's "Motion to Admit Deceased's Police Record." Attached to this motion was a record prepared by the Federal Bureau of Investigation. This record indicates that during the period 1964-1972 Neves was arrested and charged with a variety of crimes in Rhode Island, California, and Texas. These charges include malicious mischief, robbery, kidnapping, and the illegal possession of narcotics. The defendant wanted to show the jury that in California on December 16, 1966, the deceased was sentenced to serve 6 months to life imprisonment for having committed an "armed robbery in the second degree." The record indicates that Neves was paroled 3 years later in December 1969.

In presenting this motion, defense counsel told the trial justice that the armed robbery incident would corroborate Infantolino's testimony because it would show that the deceased was the type of individual a reasonable person could expect to be armed. The legal issues which the trial counsel attempted to raise, in a rather oblique manner, were discussed in *Martin* v. *Estrella,* 107 R. I. 247, 254-55, 266 A.2d 41, 47 (1970). The *Martin* case involved a civil action where the plaintiff sought damages for assault and battery. The rules of law expressed in *Martin,* however, are equally applicable to a criminal proceeding. When a defendant has pleaded self-defense, he may introduce evidence of his adversary's reputation for violent behavior in order to show either the reasonableness of the defendant's fear at being injured or the fact that the adversary was the aggressor. If the defendant was *aware* of this reputation when he defended himself, this evidence is pertinent on both issues. If he was *unaware*, the evidence is limited to determining who was the aggressor. *See also* 1 Wharton, *Criminal Evidence* §228 (1972 ed.); Annot., 1 A.L.R.3d 571 (1965).

The defendant gains no benefit from those rules for two reasons. First, at the time of the Pine Street confrontation he was unaware of the deceased's reputation. Second, even if the record indicates a conviction for robbery[4] in California, it may not be relied on because as a general rule proof of bad character may be shown only by general reputation and not by specific acts of misconduct. *Perry v. State,* 254 Ark. 939, 497 S.W.2d 10 (1973); *State v. Padula,* 106 Conn. 454, 138 A. 456 (1927); *State v. Keaton,* 258 Minn. 359, 104 N.W.2d 650 (1960); *Commonwealth v. Lacasse,* 304 N.E.2d 438 (Mass. App. 1973); *State v. Ralls,* 192 Neb. 621, 223 N.W.2d 432 (1974); 1 Wharton, *Criminal Evidence, supra,* §235; *contra, Commonwealth v. Amos,* 445 Pa. 297, 284 A.2d 748 (1971); *McMorris v. State,* 58 Wis.2d 144, 205 N.W.2d 559 (1973). We see no reason at this point to depart from the general rule.

The defendant's appeal is denied and dismissed, and the judgment of conviction is affirmed.

*Julius C. Michaelson,* Attorney General, *William Granfield Brody,* Special Asst. Attorney General, for plaintiff.

*William F. Reilly,* Public Defender, *Richard M. Casparian,* Asst. Public Defender, for defendant.

---

[4]The defendant alleges that Neves was convicted of armed robbery. However, the FBI report indicates that the conviction related to a charge of second degree robbery. The pertinent statute reads as follows: "All robbery which is perpetrated by torture or by a person being armed with a dangerous or deadly weapon, and the robbery of any person who is performing his duties as operator of any motor vehicle, streetcar, or trackless trolley used for the transportation of persons for hire, is robbery in the first degree. *All other cases of robbery are of the second degree.*" (Emphasis added.) Penal Code of California §211a (1970).