## STATE

v.

**Bernard A. TRIBBLE.**

No. 79–139–C.A.

Supreme Court of Rhode Island.

April 29, 1981.

**1080**

Dennis J. Roberts II, Atty. Gen., Alyssa L. Talanker, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

MURRAY, Justice.

As darkness approached in the late afternoon of December 15, 1976, the defendant, Bernard A. Tribble (Tribble) shot and killed Michael Wilson (Wilson) at the corner of West Broadway and Kingston Avenue in the city of Newport. The next day Tribble, accompanied by his lawyer, turned himself in to the Newport police. On March 29, 1977, a Newport County grand jury indicted Tribble on one count of murder in the first degree.[1] At trial, a justice of the Superior Court granted defendant's motion for judgment of acquittal on the murder count. However, the state was allowed to continue the prosecution on the lesser included offense of manslaughter, on which the jury subsequently returned a verdict of guilty. The defendant now appeals from the judgment of conviction.

At trial, Tribble admitted that he did in fact shoot Wilson; however, he asserted that when he did so, he was acting in self-defense and that, therefore, he should have been totally absolved from criminal liability in the death of Michael Wilson. It would be well at this point, in light of defendant's assertion of the defense of self-defense, to

---

1. In violation of G.L. 1956 (1969 Reenactment) § 11–23–1, as amended by P.L. 1974, ch. 118, § 5.

examine the events leading up to the December 15, 1976 shooting incident.

Tribble testified that a few weeks prior to the incident in question he was unemployed and that his unemployment compensation benefits had run out. Because of Tribble's financial predicament, two of his friends had offered to "put him up" in their apartment on Stewart Street in Newport until he went back to work in January. Tribble accepted their offer. One night shortly after Tribble had moved into the Stewart Street apartment, Wilson and a companion, James Carter (Carter) paid Tribble a "visit" there.[2] During this visit, Tribble testified, Wilson accused him of stealing some stereo equipment that allegedly belonged to Carter.[3] Wilson also, during this encounter, threatened to "take care" of Tribble and to kill his mother, brother, and children if he did not return the stereo.

Tribble did not encounter Wilson again until the day of the shooting when he saw him several times. The first time he saw Wilson that day was at ten or eleven o'clock that morning. As Tribble was walking to the Stewart Street apartment, he saw Wilson driving a car containing Carter and another passenger, Harold Massey (Massey). Tribble testified that as they rode by him, Carter apparently said something to the other occupants of the car and then pointed at him from inside the car.

The next encounter occurred later in the day as Tribble walked to his girlfriend's apartment on Hall Avenue. He said he saw the same car he had seen earlier in the day move down Hall Avenue and park in front of his girlfriend's apartment. Again, he saw Carter say something to the other two persons in the car, whereupon Wilson started up the car and continued down the street toward him. As the car passed him, Tribble testified, Carter began pointing at him and talking to the other two.

Tribble remained at his girlfriend's apartment for several hours even though she was at work, apparently because he feared that Wilson and his friends might break into the apartment. He decided later, however, to return home. On his way, Tribble met a friend of his who walked with him to his apartment. On their way, they observed the Wilson vehicle following them at close range, as if to monitor their progress.

Tribble testified that he had been afraid of Wilson ever since the "visit" Wilson had paid him at the Stewart Street apartment and that his fear was heightened by the events of December 15, 1976. This apprehension that Wilson might harm him or his girlfriend prompted him, once home, to get the gun which one of his roommates kept at the apartment. Aware that his girlfriend would soon return home from work, Tribble went back to her apartment with the gun. When his girlfriend returned from work, he told her to go immediately to her mother's house. He did not explain why this was necessary, nor did he explain to her the presence of the gun. On her way to her mother's house, Tribble's girlfriend dropped him off in the vicinity of the Stewart Street apartment, and he began walking the rest of the way home.

As Tribble neared the intersection of Kingston Avenue and West Broadway, the car driven by Wilson and still containing Carter and Massey rounded the corner from West Broadway onto Kingston Avenue. At trial, there was conflicting evidence as to whether Tribble hailed the car or whether Wilson stopped the car on his own volition. At any rate, Wilson did pull the car over and parked it on Kingston Avenue. Tribble then approached the car and had words with one of its occupants. According to Tribble, he spoke with Carter and told him to leave him alone. Carter and Massey testified that Tribble spoke to Wilson and that Tribble told Wilson to get out of the car. After the conversation had ended,

2. Tribble testified that Wilson kicked in the door and did not knock before entering, while Carter testified that he and Wilson knocked at the door before entering.

3. According to Tribble, the stereo was a "hot" item and Carter asked Tribble to store it in the apartment for him.

Tribble resumed walking home. At that point, Wilson got out of the car and began walking toward Tribble. Tribble testified that as Wilson reached the rear of the car, he stopped and began arguing with him and threatening him. Then, Tribble continued, Wilson started "coming at me swinging his hands." Tribble then saw Wilson put his right hand behind his back as he was coming at him. It was at this point that Tribble shot Wilson, who, according to the state medical examiner, died the next morning as a result of a gunshot wound in the area of his abdomen.

■■■■ The law relating to self-defense proclaims that one may defend himself whenever he reasonably believes that he is in imminent danger of bodily harm at the hands of another. A person harboring such a fear need not wait for the other to strike the first blow; however, such person must use only such force as is reasonably necessary for his own protection. The permissible degree of force used in defense of oneself varies with the particular set of circumstances under which he acts, but under no set of circumstances may one apply more than that degree of force necessary to prevent bodily injury. If one uses "excessive" force, he is to be held accountable for his actions. *Martin v. Estrella*, 107 R.I. 247, 253, 266 A.2d 41, 46 (1970).[4]

■■■ When a defendant asserts the defense of self-defense, he may introduce evidence of the victim's reputation for violent behavior either for the purpose of showing the reasonableness of his fear of imminent bodily harm or for the purpose of showing that the victim was the aggressor. *Id.* at 254, 266 A.2d at 47. Toward this end, defendant in the instant case elicited testimony, both upon direct examination of his own witnesses and upon cross-examination of the prosecution's witnesses, that Wilson had a reputation for violence in the community. Carter testified on cross-examination that Wilson would fight if he had to and that "some" said he was a fighter. Massey also

testified that Wilson was "a fighter." Victor Jenkins, a witness who heard the firing of the gun, was called by the state. He testified on cross-examination that Wilson was often in trouble with the police. One of defendant's witnesses also testified to the same effect. Harry B. Casey, sheriff of Newport County, testified that Wilson was an "extremely hot-tempered, violent young boy."

In addition, defendant's counsel sought to adduce through the testimony of Tribble himself that Tribble was aware of a specific act of violence committed by Wilson against a third person, one Emmett Turner (Turner). The entire line of inquiry concerning Turner, however, was objected to by the prosecutor and the objection was sustained by the trial justice. Defense counsel thereupon made an offer of proof, during which he stated:

> "If Your Honor please, I'm offering this testimony about Emmett Turner as relating to the basis for fear in this defendant, in that Mr. Tribble will testify that he confronted Emmett Turner. Emmett Turner's arm was broken and his head was welted, at the hands of Michael Wilson in that Michael Wilson also accused Emmett Turner of stealing the stereo set, and Tony Tribble was in fear that at some point in time he would suffer the same fate at the hands of Michael Wilson.

> "It is my understanding of the law, and I would submit that instances known to the defendant of other acts of violence by the decedent which caused the reasonable apprehension of fear in his mind, are admissible."

The trial justice's denial of the admission of the proffered evidence forms the basis of defendant's appeal.

On appeal, the state contends that the trial justice properly excluded the proffered evidence and in support of this contention, the state relies primarily upon *State v. Infantolino*, 116 R.I. 303, 355 A.2d 722 (1976).

---

4. Although *Martin v. Estrella*, 107 R.I. 247, 266 A.2d 41 (1970) involved a civil suit for assault, the rules therein relating to self-defense are equally applicable to a criminal proceeding. *State v. Infantolino*, 116 R.I. 303, 313, 355 A.2d 722, 728 (1976).

In that case, the defendant was convicted, among other things, of second-degree murder for shooting another man after the two were earlier involved in a barroom brawl. The defendant asserted that when he shot the victim, he was acting in self-defense. We found that

> "[i]n fact, Infantolino made it quite clear that he drew his weapon only after he allegedly saw Neves [the victim] standing on the Pine Street sidewalk pointing a gun at him. He also stated that he had fired the two shots to 'protect himself.' Infantolino's entire trial strategy was geared to the doctrine of self-defense. The defendant insisted that immediately after the fisticuffs Neves had threatened to kill him and when he encountered the deceased on the sidewalk, Neves was pointing a gun at him. Diane [the victim's girlfriend] testified that she also saw the deceased point a 'square object' at her boyfriend and that it appeared to be a gun." *Id.* at 308, 355 A.2d at 725.

At trial, Infantolino sought to introduce into evidence the police record of the victim.[5] In upholding the trial justice's refusal to allow the deceased's criminal record into evidence, we noted that at the time of the confrontation Infantolino was unaware of the victim's reputation.

Similarly, in *State v. Baker*, R.I., 417 A.2d 906 (1980) a case in which the facts surrounding the shooting are strikingly similar to those in the instant case, the defendant sought to have the victim's conviction record admitted into evidence. The trial justice, relying on *Infantolino*, refused to admit the record into evidence. Again, we noted that the defendant knew nothing about the victim's prior convictions at the time of the incident. *See State v. Baker*, R.I., 417 A.2d at 911.

To this extent, the *Infantolino* and *Baker* cases are inapposite to the case at bar. Tribble sought to introduce evidence of the victim's specific act of violence against a third party, which act Tribble was aware of at time of his confrontation with Wilson. Such is not a distinction without a difference. It is only logical to conclude that when the defendant is unaware of the victim's specific acts of violence at the time of the incident such evidence sheds no light whatsoever on whether the defendant harbored a reasonable fear of imminent bodily harm at the hands of the victim. However, when the defendant is aware, at the time of the confrontation, of prior specific acts of violence committed by the victim against a third party, as in the instant case, evidence of such awareness may be highly relevant to the question of the reasonableness of the defendant's fear of imminent bodily injury at the hands of the victim.

We now address ourselves to our holding in the above-cited cases that proof of bad character may be shown only by general reputation and not by specific acts of misconduct. *State v. Baker*, R.I., 417 A.2d at 911; *State v. Infantolino*, 116 R.I. at 314, 355 A.2d at 728. The time for a reexamination of this rule is at hand. We frame the issue thus—whether, when a defendant has asserted the defense of self-defense, evidence of the victim's prior specific acts of violence committed against third parties of which the defendant was aware at the time of the incident is admissible to establish the defendant's reasonable fear of imminent physical injury at the hands of the victim.

We note, at the outset, that there is a split in authority on this issue. A majority of jurisdictions and commentators adheres to the rule that specific acts of violence committed against third parties are admissible for the purpose of evaluating the reasonableness of the defendant's fear if it is shown that the defendant was aware of the act or acts at the time of the confrontation.[6]

---

5. Neve's record included charges for malicious mischief, robbery, kidnaping, and illegal possession of narcotics. Infantolino wanted to show that Neves received a sentence for "armed robbery in the second degree."

6. *United States v. Burks*, 470 F.2d 432 (D.C.Cir. 1972); *State v. Young*, 109 Ariz. 221, 508 P.2d 51 (1973); *Pope v. State*, 262 Ark. 476, 557 S.W.2d 887 (1977); *People v. Smith*, 249 Cal. App.2d 395, 57 Cal.Rptr. 508 (1967); *People v. Flores*, 189 Colo. 209, 539 P.2d 1236 (1975);

A minority of jurisdictions, including Rhode Island, still clings to the rule that specific acts of violence are not admissible to prove the bad character of the accused.[7]

In those states which exclude such evidence, the most frequently stated reasons for exclusion of the victim's specific acts of violence are these: that permitting proof of specific acts would create new and collateral issues, thereby prolonging the trial and confusing the jury; that a single act may have been exceptional or unusual and it therefore may not establish one's general character; and that it would place an undue burden on the state to prepare a rebuttal to each specific act of violence. *See Henderson v. State,* 234 Ga. 827, 829, 218 S.E.2d 612, 615 (1975). We are of the opinion, however, that although these considerations may at times justify the exclusion from evidence proof of such acts, they do not mandate their exclusion from evidence in every case.

According to one commentator:

"The fact that the circumstance creating apprehension is a single act or series of acts, instead of a general character, does not necessarily destroy its capacity to create apprehension. * * * Such particular acts may or may not in a given case be calculated to create apprehension; but there is no reason for a fixed rule of exclusion, invariably forbidding their consideration[.]"

2 Wigmore, *Evidence* § 248 at 61 (3d ed. 1940).

Furthermore, the highly probative nature of such relevant evidence, in an appropriate case, far outweighs any prejudice caused by the admission of such evidence.

"Knowledge of prior violent acts of the victim may weigh heavily upon the mind of a defendant when, as asserted, he moved to blunt the aggression of the victim. Indeed, knowledge of specific instances of violence by the victim may have a more significant impact on a defendant's mental state than any vague awareness of a general reputation for violence. A demonstrated capacity for acts of extreme violence will no doubt instill a fear more quickly and more deeply than a veiled threat or knowledge of a generally violent, proclivity." *People v. Miller,* 39 N.Y.2d 543, 551, 384 N.Y.S.2d 741, 747, 349 N.E.2d 841, 847 (1976).

To illustrate, we offer for consideration the following hypothetical situation set down in *Holt v. State,* 170 Tenn. 76, 92

*State v. Miranda,* 176 Conn. 107, 405 A.2d 622 (1978); *Ruffin v. State,* 50 Del. 83, 123 A.2d 461 (1956); *Williams v. State,* 252 So.2d 243 (Fla. App.1971) some overt act on part of victim is prerequisite); *State v. Lui,* Hawaii, 603 P.2d 151 (1979); *People v. Adams,* 71 Ill.App.3d 70, 27 Ill.Dec. 277, 388 N.E.2d 1326 (1979); *McKee v. State,* 198 Ind. 690, 154 N.E. 372 (1926) (cited with approval in *Schmanski v. State,* Ind., 385 N.E.2d 1122 (1979)); *State v. Mason,* 208 Kan. 39, 490 P.2d 418 (1971) (only those acts resulting in convictions may be used); *State v. Thibeaux,* 366 So.2d 1314 (La.1978); *Williamson v. State,* 25 Md.App. 338, 333 A.2d 653 (1975); *People v. Cooper,* 73 Mich.App. 660, 252 N.W.2d 564 (1977); *State v. Jennings,* 96 Mont. 80, 28 P.2d 448 (1934); *State v. Ardoin,* 28 N.M. 641, 216 P. 1048 (1923) (cited with approval in *State v. Alderette,* 86 N.M. 600, 526 P.2d 194 (Ct.App.1974)); *People v. Miller,* 39 N.Y.2d 543, 384 N.Y.S.2d 741, 349 N.E.2d 841 (1976); *State v. Barbour,* 295 N.C. 66, 243 S.E.2d 380 (1978); *Harris v. State,* 400 P.2d 64 (Okl.1965); *Commonwealth v. Stewart,* 483 Pa. 176, 394 A.2d 968 (1978); *Williams v. State,* 565 S.W.2d 503 (Tenn.1978) (only defendant may testify as to specific acts of which

he was aware committed by victim prior to the crime); *Wood v. State,* 486 S.W.2d 359 (Tex. Crim.App.1972); *Randolph v. Commonwealth,* 190 Va. 256, 56 S.E.2d 226 (1949) (admissible even if accused was unaware of the specific acts at time of incident); *State v. Upton,* 16 Wash.App. 195, 556 P.2d 239 (1976); *McMorris v. State,* 58 Wis.2d 144, 205 N.W.2d 559 (1973); *Mortimore v. State,* 24 Wyo. 452, 161 P. 766 (1916).

7. *Higginbotham v. State,* 262 Ala. 236, 78 So.2d 637 (1955); *Henderson v. State,* 234 Ga. 827, 218 S.E.2d 612 (1975); *State v. Jacoby,* 260 N.W.2d 828 (Iowa 1977); *Parrish v. Commonwealth,* 581 S.W.2d 560 (Ky.), *cert. denied,* 444 U.S. 966, 100 S.Ct. 454, 62 L.Ed.2d 378 (1979), *reh. denied,* 444 U.S. 1049, 100 S.Ct. 741, 62 L.Ed.2d 737 (1980); *State v. Mitchell,* 390 A.2d 495 (Me.1978); *Commonwealth v. LaCasse,* 1 Mass.App. 590, 304 N.E.2d 438 (1973); *State v. Maggitt,* 517 S.W.2d 105 (Mo.1975); *State v. Kimbrough,* 173 Neb. 873, 115 N.W.2d 422 (1962); *State v. Baker,* R.I., 417 A.2d 906 (1980); *State v. Padgett,* 291 N.W.2d 796 (S.D. 1980).

S.W.2d 397 (1936). An officer in performance of his duty approaches B to place him under arrest. B, defying and resisting arrest, threatens the officer. What more convincing basis of apprehension of danger from B could that officer possibly have than reliable information that two days before, B had shot and killed another officer approaching him on a like mission. Moreover, the week before last, B had committed a like offense, and that he was charged with having slain in brutal and violent fashion an innocent citizen? *Id.* at 90, 92 S.W.2d at 402.

■ The paramount purpose of our rules of evidence is to ensure that the trier of fact will have before it all relevant, reliable, and probative evidence on the issues in dispute. Evidence of specific acts of violence committed by the victim against third parties of which acts the defendant was aware would enlighten the jury on the defendant's state of mind at the time of the confrontation. It would enable them to evaluate the rationality of the defendant's actions under the circumstances. *People v. Miller*, 39 N.Y.2d at 552, 384 N.Y.S.2d at 747, 349 N.E.2d at 847. Indeed, the very essence of the defense of self-defense is how the defendant perceived the situation at the time of the incident in question. We conclude, therefore, that a change in our existing rule would better serve these ends. Consonant with the reasons outlined above, we hold that a defendant who asserts the defense of self-defense is now entitled to adduce relevant evidence of specific acts of violence perpetrated by the victim against

third parties, provided however, that the defendant was aware of these acts at the time of his encounter with the victim.[8]

■ This rule, however, is not to be implemented without limitation. When it is introduced at trial, the jury should be cautioned that such evidence is only to be considered with regard to the reasonableness of the defendant's fear that the victim was about to inflict bodily harm upon him and that the evidence is not to be considered for the purpose of establishing that he probably acted in conformity, on the occasion in question, with his prior acts of violence. *See Werner v. State*, 66 Wis.2d 736, 744, 226 N.W.2d 402, 405 (1975).

We note further that the reasons given by those authorities which do not allow such evidence are not totally devoid of merit.[9] In some cases such evidence might allow the principal issue to become lost in a maze of collateral matters especially in instances in which the proffered evidence is either too remote or simply not probative of the defendant's fear of imminent bodily harm at the hands of the accused.[10] Accordingly, a proper foundation must be laid before the trial justice can admit the evidence.

■ Before the trial justice can admit the evidence, the defendant must show that he was aware of the specific act or acts of violence and that the act or acts sought to be introduced are not too remote in time and are of such a quality as to be capable of contributing to the defendant's fear of the victim. *See People v. Flores*, 189 Colo. 209, 211, 539 P.2d 1236, 1238 (1975); *State v.*

---

8. We note here that the admission of such evidence does not violate the hearsay rule, for the statements and evidence are not offered to prove the truth of the matter asserted, *i. e.*, that the prior assault by the decedent had actually occurred, but merely as a basis for the defendant's state of mind. *People v. Flores*, 189 Colo. at 211, 539 P.2d at 1238.

9. Wigmore, however, had little problem dismissing these objections.

"When the turbulent character of the deceased, in a prosecution for homicide, is relevant * * *, there is no substantial reason against evidencing the character by *particular instances of* violent or quarrelsome con-

duct. Such instances may be very significant; their number can be controlled by the trial Court's discretion; and the prohibitory considerations applicable to an accused's character * * * have here little or no force." 1 Wigmore, *Evidence* § 198 at 676–77 (3d ed. 1940) (Emphasis in original) (footnote omitted).

10. For example, the victim's prior conviction for possession of marijuana would have no probative value on the issue of the reasonableness of the defendant's fear of the victim, even if the defendant was aware of this conviction at the time of the incident.

*Lui,* Hawaii, 603 P.2d 151, 154 (1979); *People v. Miller,* 39 N.Y.2d at 552, 384 N.Y.S.2d at 747, 349 N.E.2d at 847; *Commonwealth v. Stewart,* 483 Pa. 176, 180 n.2, 394 A.2d 968, 970 n.2 (1978). Whether the proper foundation has been laid shall rest within the discretion of the trial justice, *Commonwealth v. Amos,* 445 Pa. 297, 305, 284 A.2d 748, 752 (1971), and it shall also be within his discretion to limit the extent to which the incidents are sought to be proved.[11]

Turning now to the merits of the case before us, we note, as was pointed out in defendant's offer of proof to the trial justice, that the proffered evidence would indicate that defendant was aware of his victim's prior act of violence upon a friend of defendant, Turner. According to Tribble, Turner told him that Wilson had beaten him so severely a few weeks before that he had broken his arm and caused his face to become welted and that Wilson had done so after accusing Turner of stealing a stereo from him. This proffered evidence would clearly have been admissible had the rule we have set forth above obtained at the time of trial. The defendant was aware of this violent act when he shot Wilson, the act was not too remote and was of such a quality as to bear directly upon the reasonableness of Tribble's fear of Wilson. With this evidence before it, a jury may well have accorded more weight to Tribble's defense of self-defense.

■ The state contends that the exclusion of this evidence was harmless error if indeed it was error. We have said on many prior occasions that for exclusion of evidence to be harmless error it must appear that the excluded evidence would not have influenced the jury to reach a contrary verdict. *E. g., State v. Camerlin,* 116 R.I. 726, 731–32, 360 A.2d 862, 865–66 (1976). In this case, in which the defendant has asserted that he acted in self-defense, it cannot be gainsaid that the proffered evidence might have had a substantial influence on the jury, thus causing it to alter its verdict, especially when, as here, it was bound to evaluate the reasonableness of defendant's fear.

Although the trial justice applied the proper law at the time of this trial, we conclude that the law itself is in need of change and that the defendant in the instant case is entitled to the benefit of that change. The defendant's appeal is sustained, the judgment of conviction appealed from is vacated, and the case is remanded to the Superior Court for a new trial.

SHEA, J., did not participate.

---

11. The defendant should not be authorized to introduce an entire criminal record which may include convictions for petty matters.

"Admission of an entire criminal record is, truly, an effort to disparage the victim's general character and is not probative of the defendant's apprehensive state of mind. We, therefore, are careful to note that while specific convictions for violent acts may be admissible, provided the defendant had knowledge of same, general proof of the victim's criminal disposition is not." *People v. Miller,* 39 N.Y.2d at 553, 384 N.Y.S.2d at 748, 349 N.E.2d at 848.