July 15, 2024

**Supreme Court**

No. 2022-304-C.A.
(P1/20-3310AG)

State                         :

v.                         :

Jairo Esdel.                         :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email:  opinionanalyst@courts.ri.gov,  of  any typographical  or  other  formal  errors  in  order  that corrections may be made before the opinion is published.

State                    :

v.                     :

Jairo Esdel.              :


Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

### O P I N I O N

**Justice Goldberg, for the Court.**  The defendant, Jairo Esdel (defendant or Esdel), appeals from a Superior Court judgment of conviction for second-degree murder;[1] discharging a firearm during a crime of violence, resulting in the death of the decedent, Joel Rosario (the decedent or Rosario); and several additional firearm offenses.  On appeal, the defendant contends that the trial justice erred by (1) refusing to give a lesser-included offense instruction on voluntary manslaughter; (2) excluding testimony from the defendant's grandfather about a verbal threat to kill the defendant made by the decedent shortly before the shooting; (3) excluding the

---

[1] We note at the outset that the judgment of conviction in this case is incorrect.  The judgment declares that defendant was convicted of murder in the first-degree.  According to the transcript, the jury found defendant guilty of second-degree murder and the court's sentence reflected second-degree murder.

testimony of the defendant's grandfather and another witness, both of whom witnessed a violent prior altercation instigated by the decedent upon the defendant; and (4) determining that a social media post (the WhatsApp video), depicting the decedent brandishing a firearm, was inadmissible. For the reasons stated herein, we vacate the judgment of the Superior Court.

**Overview**

By way of background, this appeal arises out of events that transpired on the evening of October 31, 2020. That evening, defendant was driving on Lonsdale Avenue and stopped for a traffic light at the intersection of Lonsdale and Mineral Spring Avenues in Pawtucket, Rhode Island. When the light turned green the events—to which several witnesses and defendant testified at trial—occurred within a matter of seconds. Several other vehicles were also waiting for the light to change. When the light eventually changed, however, the vehicles in the front and side of Esdel's vehicle came to an abrupt stop; several individuals—some of whom were armed—exited their vehicles, and quickly surrounded defendant, who remained inside his vehicle.[2]

---

[2] According to a video from a Grubhub food delivery driver (the Grubhub video) that was presented at trial, there were approximately four to five vehicles surrounding defendant's vehicle (the Jeep). We note, however, that some witnesses testified that not all of the vehicles were related to the shooting. Despite defendant's attempts to escape the scene—testifying that he put the Jeep in reverse "as much as [he] possibly [could,]" then "[he] put the car in drive," and that his "sensors in [his] Jeep [were] going off * * * letting [him] know that there's either a person or an

- 2 -

In those few seconds, Esdel—who testified that he was trapped, felt threatened, and thought that his life was in peril—reached for his bag, grabbed a revolver, raised his right arm, and fired a single shot through his passenger window. The defendant shot Rosario, an individual with whom he had previous encounters. Rosario later died at a nearby hospital. At trial, defendant asserted the defense of self-defense. This Court observed in *State v. Tribble*, 428 A.2d 1079 (R.I. 1981), that "the very essence of the defense of self-defense is how the defendant perceived the situation at the time of the incident in question." *Tribble*, 428 A.2d at 1085. Thus, we focus the relevant facts of this appeal on defendant's trial testimony and supplement the facts with the testimony of other witnesses.

**Facts and Travel**

On or about October 31, 2020, defendant awakened at approximately 8 or 9 a.m. to go to work, where he was scheduled to work a nine-hour shift from 11 a.m. to 8 p.m. At the end of his shift, Esdel drove to Central Falls to visit his friend, Claudia Silva (Silva), with whom he shared a romantic relationship; however, when Esdel arrived at Silva's home, she told him she was sick and not to come inside. Because Esdel had already planned to stop by his mother's house to retrieve a few items of clothing, he offered to pick up food for Silva along the way on nearby

---

object close by. So [he] didn't have any space, any room to go forward[]"— defendant appears in the video to be trapped.

- 3 -

Thayer Street. When Esdel arrived at his mother's home, he testified, he packed a few things, including his friend's revolver, and then "[took] the duffle bag. I [got] in my vehicle," and was on his way.[3] The defendant was driving a 2019 Jeep Grand Cherokee (the Jeep) and placed the duffel bag, with the revolver, on the front passenger seat. The defendant eventually turned onto Pine Street and then took another turn onto Rand Street, at which point he noticed two vehicles—one of which was a Toyota Corolla, which he recognized as belonging to Sleither Feliz (Sleither).[4] Esdel turned onto Watson Street and briefly lost sight of Sleither's Toyota and the other vehicle.

As he turned onto Lonsdale Avenue, defendant testified, he yielded to two vehicles in front of him and recounted that it appeared these two vehicles were together. From Lonsdale Avenue, defendant proceeded toward I-95 South; however, defendant testified that while on Lonsdale Avenue he saw the decedent "hang[ing] out [one] of the vehicle[s]" and making hand gestures, including the gesture of

---

[3] At trial, Esdel admitted he did not own this revolver, but that it was his friend's revolver, which he was temporarily holding onto at his friend's request.

[4] We note that there are multiple individuals involved with this case who share the same surname, as well as individuals who were referred to by first name in the lower court proceedings. As indicated at each individual's introduction, we refer to these individuals by first name in order to avoid confusion. We intend no disrespect.

holding a gun.[5]  Esdel continued on Lonsdale Avenue and stopped for a red light at the intersection of Lonsdale Avenue and Mineral Spring Avenue, where these events unfolded.

While waiting at the light, Esdel noticed Sleither's vehicle. The defendant testified that he was not afraid as he waited for the light to change, but fear set in *after* the light turned green and the vehicles in front of him abruptly stopped and disgorged passengers.  Specifically, defendant recalled that when the light turned green, he and the surrounding cars began to proceed, but the car immediately in front of him suddenly "stop[ped] on a dime."  Esdel rolled down his passenger window to urge the driver to continue with the flow of traffic, but it was too late.  The decedent had exited Sleither's vehicle, wearing a white ski mask and carrying what appeared to be a bottle in his right hand.[6]  Throughout trial, defendant maintained that he observed the decedent exiting Sleither's vehicle wearing a "ski mask [that] was fully on the whole entire time."  The defendant testified that the decedent approached the Jeep and made a hand gesture to defendant signaling that he was carrying a firearm.

---

[5] Esdel clarified during his testimony that he did not see a firearm at this point, but that the decedent only made the hand gesture of holding a gun while hanging out of the vehicle.

[6] There is trial testimony that is contradictory as to whether or not the decedent struck the Jeep with the bottle.  However, on cross-examination, Esdel maintained that the decedent hit the hood of his car because he heard the loud bang and felt the vibrations from below.

Esdel later testified that he saw what appeared to be the handle of a black pistol on the decedent's person, stating that "[a]t that time my passenger window was halfway down," and the decedent "showed me a firearm."

Within seconds, Esdel was surrounded by individuals from three or four vehicles: two were at the front of his Jeep, two others at his passenger door, and one individual standing in the middle of the roadway. Although it was defendant's initial intent to urge the driver in front of him to proceed forward, Esdel froze and testified that by the time he did so, "[he] didn't get to say anything because right after [he rolled his window down,] [the decedent] and the rest of the individuals had gotten out of the vehicles." "Everything happened so fast * * *."[7]

According to defendant, when he saw who he believed to be the decedent carrying a black pistol, he ducked down, reached over to his duffel bag, retrieved a revolver, and simultaneously attempted to put his Jeep into reverse, and then into drive, in the hope, he testified, of escaping the situation. But as defendant maintained throughout his testimony, it was too late; defendant was surrounded. Sensing he was in grave danger, Esdel reiterated several times what ran through his mind, stating:

> "[DEFENDANT]: * * * I didn't have any space, any room to go forward. So at that time, my heart's going fast. I

---

[7] These events appear on the Grubhub video, including a man wearing a ski mask, surrounding defendant's vehicle.

panic. And I lift up my right arm, and I let off a shot. I let off a single shot off the passenger door.

"* * *

"[DEFENDANT]: I was in fear for my life. Yes. I was under attack. I was seeing someone right next to my window with a ski mask. I seen him previously with a firearm. I know him to previously carry firearms. I would always see him with firearms."

After the gunshot, defendant testified that "[e]veryone backed away from my vehicle, and I immediately took off." Esdel testified that he left the scene because "I didn't want to be there in the first place. I felt boxed in. I felt cornered. I just wanted to get out of the area. I wanted to leave the area. I thought my life was over at that point. I wanted to leave the area."

In support of his claim of self-defense, defendant sought to introduce testimony and other evidence regarding three separate incidents involving the contentious relationship between the decedent and defendant. First, defendant contends that the trial justice improperly excluded the testimony of his grandfather, Jaime Galva (Jaime or grandfather),[8] who, defendant claims, was an eyewitness to a threat to kill that the decedent made to him, shortly before the shooting, telling Jaime,

---

[8] We refer to defendant's grandfather as "Jaime" or "grandfather" to avoid confusion with defendant who also shares the same surname. We further note that defendant clarified any discrepancies as to his legal name and provided that some official documents refer to him as "Jairo Esdel Galva." We intend no disrespect.

"Take Jairo for dead." The defendant further testified that when his grandfather told him later that day about this threat, defendant stated that he felt "nervous for myself," but that he was also concerned for his eighty-three-year-old grandfather.

Second, defendant asserts that the trial justice's exclusion of two individuals who were eyewitnesses to a pistol-whipping incident was erroneous. On June 16, 2018, defendant arrived at his mother's home and saw Sleither and the decedent hanging out in front of her house. Esdel testified that he "immediately went over there and I told them that I didn't want them anywhere near my family's house. I told them I wanted them to leave the area." He was insistent that Sleither and the decedent leave because he knew that they would be selling drugs, and that "[he] didn't want anything happening in front of [his] mother's house * * *." Sleither and the decedent began yelling, "but they eventually got in their cars and they left." This initial encounter on June 16, 2018, did not become physical, but that evening, between 9 and 10 p.m., the decedent and Sleither returned to Esdel's mother's home and stopped in the middle of the street, and "[t]hey immediately jump[ed] out of [Sleither's] vehicle. [The decedent] comes out of the passenger side. When [the decedent] comes out, he comes out with a gun * * *." According to defendant—who was standing on the sidewalk with his sister—he saw the decedent approach him while loading a gun, and recounted that he froze, stating that he did not know what to do because "[t]here was nowhere for me to run." Once the decedent was

close enough, he pistol-whipped defendant, causing him to fall to the pavement, and a scuffle ensued. As a result of the pistol-whipping, defendant testified, he sustained a scar on his head where he had been hit. Esdel's family, who were in the backyard of his mother's home, heard the commotion. The defendant's stepfather intervened and grabbed Rosario. Rosario struck defendant's stepfather with the gun and fled the scene immediately. Although the Central Falls police responded to defendant's mother's home a total of three times that day, Esdel did not report the pistol-whipping incident, and instead, repeatedly told officers that he was fine and refused medical assistance for his obvious injuries.

The defendant's third contention on appeal concerns evidence of a social media post that the trial justice ultimately determined to be inadmissible because the video lacked proper authentication pursuant to Rule 901 of the Rhode Island Rules of Evidence.[9] *See* R.I. R. Evid. 901. This WhatsApp video purportedly depicted the decedent "listening to Spanish rap, * * * waving a gun around and singing a song, the lyrics to the rap." Before this Court, defendant submits that the WhatsApp video,

---

[9] Rule 901 of the Rhode Island Rules of Evidence, "Requirement of authentication or identification," states in part:

> "(a) *General Provision.* The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

purportedly published the day of the incident, was critically relevant to the jury's consideration of whether the decedent, in fact, possessed a firearm on the day he was killed.

Significantly, the events that unfolded at the intersection of Lonsdale and Mineral Spring Avenues on October 31, 2020, were also captured on video (the Grubhub video) by John Viveiros (Viveiros), a bystander witness to the incident that evening, who was picking up a food delivery order, when he saw the decedent and several individuals surround defendant's Jeep. Viveiros submitted the video evidence to the Pawtucket police and testified at trial as to the events he observed that evening. The Grubhub video went before the jury. Viveiros testified that, at approximately 10:30 p.m. on October 31, 2020, he was at the McDonald's located at the intersection of Lonsdale and Mineral Spring Avenues. As he left McDonald's with the food order, there was "[a] disturbance in front of [his] vehicle[,]" and he heard "a bunch of yelling" from the vehicles on the roadway. After Viveiros heard the shouting, he testified, "they all started swarming the [Jeep], and then you heard the bang," which "definitely came from the [Jeep]." After the gunshot, he testified, "everyone scattered away. * * * I didn't think it was a gunshot * * *. I thought it was like a fire cracker or something, it was Halloween night, and that's when I did my delivery, and then I watched the video after." Viveiros did not realize it was a gunshot until after the fact, nor did he realize someone had been shot. Viveiros

- 10 -

completed a few more deliveries, and then turned the video over to the Pawtucket police, stating that from what he could see that night, he did not notice any of the individuals in the roadway with weapons, but that he saw one individual wearing a mask.

According to several witnesses and the Grubhub video, after the gun was fired the decedent ran towards Sleither, told him he had been shot, and with the help of Starlyn Mercado (Starlyn), one of the participants in this melee, entered Sleither's vehicle and immediately was driven to the hospital. Starlyn carried the decedent into the hospital, and after some time elapsed, Starlyn and the assemblage, consisting of Sleither and Jeremy Rosario (Jeremy)—another individual involved in the incident, along with several others—were informed that the decedent had died.

The Pawtucket police had arrived and began conducting witness interviews. Patrolman Nicholas Sisto of the Pawtucket Police Department testified that on the evening of the incident, he was dispatched to 1057 Main Street to a call of a "rolling disturbance." He arrived at the hospital approximately two minutes after receiving the dispatch to investigate and determine the "baseline story." Officer Sisto also testified that Sleither's vehicle was secured at the scene "so nobody could go near it" and that the vehicle was later transported to the Pawtucket police headquarters. Detective Andrew Torres testified that he was assigned as lead detective; when he arrived at the hospital, Sleither's Toyota had been secured, and the Pawtucket Police

- 11 -

Department's Bureau of Criminal Investigation (BCI) had been notified to document the vehicle and take photographs. Detective Torres further recounted that, after the BCI responded, the Toyota was towed to the Pawtucket police station. During closing arguments, the state argued to the jury that no weapon was recovered from Sleither's vehicle when the Pawtucket police conducted an inventory search.[10] This was after the participants exited the vehicle at the hospital.

On November 16, 2020, Esdel was indicted by a grand jury and charged with the following counts: murder, in violation of G.L. 1956 § 11-23-1 (count 1); discharging a firearm while committing a crime of violence, in violation of G.L. 1956 § 11-47-3.2(b)(4) (count 2); discharging a firearm from a motor vehicle in a manner that created a substantial risk of death or serious injury, in violation of § 11-47-61 (count 3); and carrying a pistol without a license or permit, in violation of § 11-47-8(a) (count 4). The defendant was found guilty on all counts. As to count 1, the trial justice sentenced Esdel to life in prison for second-degree murder (count 1); as to count 2, defendant was sentenced to serve a second life sentence, which was to be served consecutively to count 1; as to count 3, defendant was sentenced to serve an additional ten years suspended and ten years of probation, consecutive to count 2; and as to count 4, defendant was sentenced to ten years suspended and ten

---

[10] Before this Court, defendant additionally notes that no ski mask was found in the Toyota.

- 12 -

years of probation to run concurrently with count 3 and consecutively to count 2. This timely appeal ensued. Additional relevant facts will be set forth as necessary.

## Standards of Review
### Jury Instructions

"This Court reviews 'jury instructions on a *de novo* basis.'" *State v. Isom*, 251 A.3d 1, 6 (R.I. 2021) (quoting *State v. Ros*, 973 A.2d 1148, 1166 (R.I. 2009)). "It is well established that, on review, we examine jury instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them." *Id.* (quoting *Ros*, 973 A.2d at 1166). "This Court will not examine a single sentence apart from the rest of the instructions, but rather the challenged portions must be examined in the context in which they were rendered." *Id.* (quoting *Ros*, 973 A.2d at 1166).

### Evidentiary Issues

"When an issue concerning the admission or exclusion of trial evidence is properly preserved for appellate review, this Court employs an abuse of discretion standard of review." *State v. Doyle*, 235 A.3d 482, 493 (R.I. 2020). We have also stated that "we will reverse a trial justice's ruling on the admissibility of evidence only where it constitutes a clear abuse of discretion." *Id.* (quoting *State v. Clements*, 83 A.3d 553, 561 (R.I. 2014)).

## Discussion

## Voluntary Manslaughter Instruction

On appeal, defendant argues that the trial justice committed reversible error by not instructing the jury on the lesser-included offense of voluntary manslaughter. Although the trial justice instructed the jury on self-defense, he refused to include an instruction of voluntary manslaughter. Based on the evidence presented at trial, Esdel asserts that there was sufficient evidence to support a conviction of voluntary manslaughter, and, therefore, the trial justice erred in refusing to so instruct. We agree.

"When determining whether a trial justice's refusal to give an instruction was warranted, 'this Court will examine the record in the case and determine whether the evidence justifies such an instruction.'" *State v. Fry*, 130 A.3d 812, 820 (R.I. 2016) (quoting *State v. Motyka*, 893 A.2d 267, 281 (R.I. 2006)). "In making this determination, our review is limited to 'ascertaining whether an actual and adequate dispute exists as to the distinguishing element between the lesser and greater offenses in question.'" *Id.* (quoting *Motyka*, 893 A.2d at 281). This Court has also stressed that an instruction on a lesser-included offense should be given when "some minimal evidence exists that, if credited by the jury, could support a conviction for the lesser-included offense." *Id.* (quoting *Motyka*, 893 A.2d at 284). "On the other hand, however, this Court has repeatedly recognized that 'a trial justice is not

- 14 -

required to instruct the jury on a lesser-included offense when the evidence presented at trial completely fails to support such a charge.'" *Id.* (brackets omitted) (quoting *Motyka*, 893 A.2d at 285).

In *State v. Gautier*, 950 A.2d 400 (R.I. 2008), we observed that, "[i]n determining whether the evidence calls for a lesser-included-offense instruction, the trial justice should not weigh the credibility of the testimony; rather, he or she should consider whether, *at the very least*, *some minimal evidence exists that*, *if credited by the jury*, could support a conviction for the lesser-included offense." *Gautier*, 950 A.2d at 414 (emphasis added) (quoting *State v. McGuy*, 841 A.2d 1109, 1112 (R.I. 2003)). In *State v. Ruffner*, 911 A.2d 680 (R.I. 2006), we recognized that the element of malice is the distinguishing factor between voluntary manslaughter and murder. *Ruffner*, 911 A.2d at 686. "Murder, both first and second degree, 'is the unlawful killing of a human being with malice aforethought.'" *Id.* (brackets omitted) (quoting § 11-23-1). Whereas "[v]oluntary manslaughter is a lesser-included offense within the crime of murder, and is defined as 'an intentional homicide *without* malice aforethought committed in a sudden heat of passion as a result of adequate legal provocation.'" *Ruffner*, 911 A.2d at 686 (brackets omitted) (emphasis added) (quoting *State v. Ortiz*, 824 A.2d 473, 486 (R.I. 2003)).

Voluntary manslaughter is defined as "an intentional homicide that does not include the element of malice aforethought by reason of one or more mitigating

- 15 -

factors." *State v. Ventre*, 811 A.2d 1178, 1184 (R.I. 2002). "The usual view of voluntary manslaughter thus presupposes an intent to kill (or perhaps an intent to do serious injury or to engage in very reckless conduct), holding that in spite of the existence of this bad intent the circumstances may reduce the homicide to manslaughter." *Ortiz*, 824 A.2d at 486 (quoting Wayne R. LaFave, *Criminal Law* § 7.01(a) at 704 (3d ed. 2000)). Second-degree murder can be established in cases in which the evidence demonstrates that the accused acted with wanton recklessness resulting in the death of one or more persons. *See State v. Iovino*, 524 A.2d 556, 558 (R.I. 1987). It is well established that "wanton recklessness can supply the element of malice that is necessary to raise homicide to the level of common-law murder." *Id.* Malice can consist of "an unjustified disregard for the possibility of death or great bodily harm and an extreme indifference to the sanctity of human life." *State v. McGranahan*, 415 A.2d 1298, 1302 (R.I. 1980).

Voluntary manslaughter requires adequate provocation, which "arises, *inter alia*, when the defendant reasonably fears imminent death or serious bodily harm." *Ruffner*, 911 A.2d at 686. This Court has stated that "[h]eat-of-passion manslaughter exists when: '(1) the provocation * * * is so gross as to cause the ordinary reasonable man to lose his self-control and to use violence with fatal results, and (2) the defendant * * * is deprived of his self-control under the stress of such provocation and * * * committed the crime while so deprived.'" *Id.* (brackets omitted) (quoting

*State v. Garcia*, 883 A.2d 1131, 1137-38 (R.I. 2005)).  "Courts should apply an objective standard to determine whether an alleged provocation is legally sufficient" to warrant an instruction on voluntary manslaughter. *McGuy*, 841 A.2d at 1113. The element of adequate provocation is satisfied by evidence that establishes a reasonable fear of imminent death or serious bodily harm. *Id.* In *Ventre*, this Court held that "[i]n light of [the] defendant's claim of having been set upon by four assailants, an instruction on manslaughter would have been appropriate." *Ventre*, 811 A.2d at 1184.  It is well established that "[h]eat of passion may be aroused by fear and terror as well as anger." *Id.* (quoting *State v. Fetzik*, 577 A.2d 990, 995 (R.I. 1990)).

According to Esdel's testimony, it is apparent that defendant, the decedent, and the other individuals in adjacent vehicles began to proceed through the intersection when everyone came to an abrupt stop.  Esdel, who was forced to stop, rolled down his window, and within seconds saw the decedent exit the vehicle, wearing a white ski mask covering his entire face, holding a bottle in his right hand, and making gestures with his other hand, suggesting that he was carrying a pistol.[11] It was at this moment that defendant froze.

---

[11] Although some witnesses at trial disputed whether the decedent's bottle actually struck the hood of Esdel's Jeep, Esdel stated that "I heard it. I felt it inside the vehicle. [The decedent] hit it pretty hard."  Based on the Pawtucket police BCI unit's photographs of defendant's Jeep, Detective Torres testified that the dent that was present on the hood of the vehicle was "consistent with witness accounts."

- 17 -

The defendant immediately was surrounded and outnumbered by a group of angry individuals, including the decedent and Starlyn—who defendant testified were peering into his passenger window—and heard them yell "[defendant is] alone, he's alone." The defendant also testified that he could hear people grabbing the door handles of his locked Jeep, while the decedent shouted, "I'm going to kill you. Come out the car. Stop the car." Outnumbered, and in fear of his life, Esdel—who had ducked down below his passenger window—testified that he reached over and grabbed the revolver because "[he] didn't have any space, any room to go forward * * * [defendant] lift[ed] up [his] right arm, and [he] let off a * * * single shot off the passenger door."

Repeatedly throughout his testimony, defendant expressed his belief that his life was in grave danger and that he had no choice but to fire his weapon, stating:

> "[DEFENDANT]: * * * I believe the person on my passenger door is going to let off a shot. I can't -- I don't -- I can't see what he's doing with his hands. * * * So I didn't have any * * * room to go forward. So at that time, my heart's going fast. I panic. And I lift up my right arm, and I let off a shot.
>
> "* * *

We note that at least one witness was less than truthful, and directly contradicted herself during her testimony. We credit defendant's testimony pursuant to our caselaw under *State v. Tribble*, 428 A.2d 1079 (R.I. 1981), that "the very essence of the defense of self-defense is how the defendant perceived the situation at the time of the incident in question." *Tribble*, 428 A.2d at 1085.

"[DEFENDANT]: * * * *I believe my life was at risk.  I believe I had to shoot.*  I never seen -- every time I see someone with a ski mask, they want to do something bad, their intentions -- they want to do something bad.  And not only that, I would see that individual and that queue of individuals with guns all the time.  So I knew my life was -- *I knew my life was at danger.*

"* * *

"[DEFENSE COUNSEL]: So just one last question, at the very moment that you pulled that trigger of that revolver, *did you fear for your life*?

"[DEFENDANT]: *I was in fear for my life. Yes.*  I was under attack.  I was seeing someone right next to my window with a ski mask.  I seen him previously with a firearm.  I know him to previously carry firearms.  I would always see him with firearms.  Yes." (Emphases added.)

We are hard-pressed to perceive why an instruction on voluntary manslaughter was not warranted in this case.  The record does not assist us.  The facts are straightforward.  It was late evening when the incident occurred.  The defendant, who had to "stop on a dime," at the intersection when the light already had turned green, quickly became outnumbered, and testified that the decedent was wearing a ski mask, carrying a pistol, and making verbal threats (*viz.*, "I'm going to kill you. Come out the car. Stop the car.").  Esdel testified that—in a matter of seconds—he responded to these life-threatening circumstances by raising his right arm and letting off a single shot through his passenger window.  The credibility of

this testimony is committed to the jury; and, if believed, this evidence can serve to negate the element of malice aforethought for second-degree murder.

With respect to the element of "sudden heat of passion," we conclude that the evidence in this case, if believed, included more than a scintilla of evidence that defendant acted in a sudden heat of passion prompted by fear such that a jury could find defendant was so "deprived of his self-control" under the stress of such provocation that led him to quickly lean over to this passenger seat, grab the revolver, and let off a single warning shot. *See Ruffner*, 911 A.2d at 686 (brackets omitted); *see also* § 11-23-1.

At the close of evidence, and prior to charging the jury, the court held an in-chambers conference, on the record, concerning his jury instructions.[12] At the outset of his ruling, the trial justice noted "now that [defendant's] testimony is of record it is clear to me that a second degree recklessness [instruction] must be given. Beyond that I will not reach." The trial justice explained why he intended to instruct the jury on second-degree murder and made a passing reference to voluntary manslaughter. In doing so, he referenced defendant's testimony:

---

[12] During the in-chambers conference, the trial justice assured counsel that their "objections will serve as objections were you to have come to the bench after my charge, so that you don't have to do it again." In other words, the trial justice stated that "[a]ny objections [counsel] place and speak upon the record[,] [in chambers,] will be preserved."

"I look at the facts and the evidence before me and what I consider from the defendant's own testimony: That he was ducking and bobbing up and down, trying to back up with his hand on the gearshift and at the same time with his hand on the weapon, trying to control the steering wheel and crouching down behind what he thought was a tinted window on his own to hide, sensors in the vehicle going off, and firing blindly, as he called it, a warning shot, in the very direction of where he had seen [the decedent] beside his passenger window. *That is about as reckless the use of a firearm as one can imagine, and, accordingly, it's clear that the second-degree recklessness instruction must be given.*"[13] (Emphasis added.)

His ruling on a voluntary manslaughter instruction consisted of the following:

"The instruction that I have drafted, * * * does not need your comment about adequate provocation.  That speaks to voluntary manslaughter, not second-degree murder."[14]

In reviewing defendant's testimony, the previous violent assault, the recent threat to kill made by the decedent, and the Grubhub video, which is compelling evidence, we conclude there was *more than minimal* evidence placed before the jury to support a conviction for voluntary manslaughter. *See Gautier*, 950 A.2d at 414. The evidence in this case that defendant was in fear for his life coupled with how

---

[13] Legal malice to support a conviction for second-degree murder "can arise from either an express intent to kill or to inflict great bodily harm, *or* from wanton recklessness." *State v. Mattatall*, 603 A.2d 1098, 1106 (R.I. 1992).

[14] We note that the jury deliberations in this case spanned three days.  On the final day of deliberations, the jury sent the trial justice a note that read: "We are split between Second degree and Self defense."  However, before the trial justice had an opportunity to address the note, a verdict for second-degree murder was reached.

- 21 -

quickly these events transpired, and the decedent's prior hostile history with defendant—who was known to carry a firearm—are factors that could lead defendant to fire the weapon in the heat of passion on sudden provocation.

In refusing to instruct on the lesser-included offense, the trial justice abused his discretion and committed reversible error. The record before us contains more than minimal evidence, which, if credited by the jury, could have supported a conviction for voluntary manslaughter.

### Exclusion of Testimony

Two of the four issues defendant raises on appeal concern whether the trial justice's exclusion of certain witness testimony prejudiced defendant's claim of self-defense. First, defendant asserts that the trial justice should have permitted Esdel's grandfather to testify about a threat to kill that the decedent made to him relative to Esdel shortly before the shooting. Second, defendant contends that the trial justice erred when he precluded the testimony of another witness, and also that of defendant's grandfather, both of whom witnessed an altercation between the decedent and defendant in 2018, during which the decedent pistol-whipped defendant. Esdel submits that the trial justice's exclusion of those witnesses deprived him of relevant evidence to establish his claim of self-defense. We agree and conclude that the exclusion of defendant's grandfather from testifying about the decedent threatening to kill defendant shortly before this incident is reversible error,

- 22 -

but the preclusion of testimony regarding the 2018 pistol-whipping encounter, although erroneous, amounted to harmless error.

We first reiterate this Court's longstanding principles of self-defense.

> "Under the law relating to self-defense, one may defend oneself whenever one reasonably believes that he or she is in imminent danger of bodily harm at the hands of another. Such a person, having the fear, need not wait for the other to strike the first blow. However, such a person must use only such force as is reasonably necessary for his own protection. The permissible degree of force used in defense of oneself varies with the particular set of circumstances in which he or she acts, but in no set of circumstances may one apply more than that degree of force necessary to prevent bodily injury." *In re J.S.*, 91 A.3d 845, 851 (R.I. 2014) (quoting *State v. Linde*, 876 A.2d 1115, 1129 (R.I. 2005)).

"[T]he very essence of the defense of self-defense is how the defendant perceived the situation at the time of the incident in question." *Id.* (internal quotation marks omitted) (quoting *State v. Urena*, 899 A.2d 1281, 1288 (R.I. 2006)). It is this Court's longstanding principle "that a defendant who contends that he or she acted in self-defense is entitled to present evidence" of prior violent acts by the decedent that were known to the accused "in order to show that the defendant's fear of injury was reasonable or to show that the victim was the aggressor." *Id.* (quoting *State v. Cotty*, 899 A.2d 482, 494 (R.I. 2000)). Evidence of prior acts that were known to the accused is not restricted to defendant's testimony. *See Tribble*, 428 A.2d at 1085. "Once a defendant has satisfied the burden of presenting sufficient evidence to raise

the issue of whether he or she acted in self-defense, it becomes the state's burden to disprove [self-defense] beyond a reasonable doubt." *In re J.S.*, 91 A.3d at 851 (brackets omitted) (quoting *State v. Lopez*, 943 A.2d 1035, 1045 (R.I. 2008)). Thus, we have held:

> "Evidence of *specific acts of violence committed by the victim against third parties of which acts the defendant was aware would enlighten the jury on the defendant's state of mind at the time of the confrontation*. It would enable them to evaluate the rationality of the defendant's actions under the circumstances." *Tribble*, 428 A.2d at 1085 (emphasis added).

"[T]he highly probative nature of such relevant evidence, in an appropriate case, far outweighs any prejudice caused by the admission of such evidence." *Id.* at 1084.

> "Knowledge of prior violent acts of the victim may weigh heavily upon the mind of a defendant when, as asserted, he moved to blunt the aggression of the victim. Indeed, knowledge of specific instances of violence by the victim may have a more significant impact on a defendant's mental state than any vague awareness of a general reputation for violence." *Id.* (quoting *People v. Miller*, 349 N.E.2d 841, 847 (N.Y. 1976)).

It is, therefore, this Court's determination, that the purpose of our rules of evidence is to "ensure that the trier of fact will have before it all relevant, reliable, and probative evidence on the issues in dispute." *Id.* at 1085.

This Court had the occasion to address our holding in *Tribble* in *State v. Dellay*, 687 A.2d 435 (R.I. 1996), and declared that:

"A *defendant who asserts the defense of self-defense is now entitled to adduce relevant evidence of specific acts of violence perpetrated by the victim against third parties*, provided however, that the defendant was aware of these acts at the time of his encounter with the victim. This rule, however, is not to be implemented without limitation. * * * Such evidence is only to be considered with regard to the reasonableness of the defendant's fear that the victim was about to inflict bodily harm upon him * * * [and] the evidence is not to be considered for the purpose of establishing that he probably acted in conformity, on the occasion in question, with his prior acts of violence." *Dellay*, 687 A.2d at 438 (brackets and original emphasis omitted) (emphasis added) (quoting *Tribble*, 428 A.2d at 1085).

With these principles in mind, we turn to the trial justice's preclusion of the grandfather's testimony about the threat to kill, and the preclusion of eyewitness testimony with respect to the 2018 pistol-whipping altercation.

### "Take Jairo For Dead"

The defendant submits that the trial justice's decision to preclude Jaime's testimony inhibited defendant's affirmative defense of self-defense and argues that Jaime's anticipated testimony of the threat, "Take Jairo for dead[,]" is nonhearsay evidence and serves as circumstantial evidence to support defendant's state of mind at the time of this incident and whether he was in fear of death or serious bodily harm. The defendant has argued that his grandfather would have testified that a mere two weeks before this incident, the decedent approached him and verbally threatened

- 25 -

to kill defendant, his grandson. The defendant pointed to *Ventre*, where this Court observed:

> "[W]hen self-defense is asserted, a defendant has a right to present not only reputation evidence but specific instances that tend to prove a victim's propensity for violence. This is particularly true when these instances of violence are known to defendant and would be relevant to determining his state of mind and whether he would be in fear of death or serious bodily harm." *Ventre*, 811 A.2d at 1182.

Before trial, defendant contended that Jaime's testimony would have demonstrated a reputation for violence by the decedent and that this threat was known to defendant. *See Ventre*, 811 A.2d at 1182. Had the jury heard Jaime's testimony regarding this threat, defendant asserts it would have established that the decedent declared an intent to kill defendant to his grandfather shortly before the shooting in this case. This evidence was offered to show that defendant's fear was reasonable and that he was under threat of death when he fired a single shot, and further was evidence that the decedent was the aggressor.

The defendant filed a motion *in limine* seeking to introduce this evidence pursuant to Rule 803(3).[15] The state objected, arguing that there was "no indication

---

[15] Rule 803 of the Rhode Island Rules of Evidence, "Hearsay exceptions; availability of declarant immaterial," states in part:

> "(3) *Then Existing Mental, Emotional, or Physical Condition*. A statement of the declarant's then existing

of where this occurred, when it occurred, [or] whether anybody else was present" and that the statement was inadmissible hearsay. After considering the parties' arguments, the trial justice initially determined that the evidence would not be admissible. Although the issue remained open for reconsideration at trial, the trial justice ultimately excluded the testimony under Rule 403.[16] The defendant was permitted to testify that his grandfather conveyed the threat to him, with no hearsay objection from the state, and recounted that after his grandfather told him what had occurred, he was nervous for himself and he was also concerned for his grandfather.

In a midtrial in-chambers conference, on the record, defense counsel reiterated that as part of defendant's claim of self-defense, he wished to present two

---

state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

[16] Rule 403 of the Rhode Island Rules of Evidence, "Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time," states:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." (Brackets omitted.)

additional witnesses, one of which was Jaime.[17]  In a pretrial hearing, defense counsel previously represented that defendant's grandfather, an eyewitness, would testify that the decedent approached him and repeated the verbal threat "Take Jairo for dead" three times.  Defense counsel also sought to have Jaime and another eyewitness testify as to the 2018 pistol-whipping incident.  The state objected and argued that *defendant* could offer this testimony but that these witnesses could only offer opinion evidence about the decedent's reputation for violence, and could not testify about specific acts. The state further objected, contending that although defendant may testify to any specific act that is relevant to his reasonable fear, it must be relative to "[defendant's] subjective reasonable fear on the night in question." The trial justice excluded defendant's grandfather from testifying on Rule 403 grounds.  He determined:

> "THE COURT: * * * Clearly the defendant was not present to hear [the decedent] pass the alleged comment to Jaime Galva.
>
> "* * *
>
> "I'm not about to permit others to take the stand and recite more of what was scarcely permissible, if at all, the first time, from the defendant's testimony.  It would, in any

---

[17] Defense counsel sought to introduce Rafael Acevedo (Acevedo), a witness who it was anticipated would offer his observations regarding the alleged 2018 pistol-whipping incident.  Acevedo's testimony and the court's ruling will be addressed *infra*.

event, be entirely inappropriate even if the evidence which defense counsel now seeks to be admitted were marginally relevant. * * * It should be disallowed as it would undoubtedly lead to mini trials during the State's anticipated rebuttal * * *."

And further stated:

"[A]side from admissibility problems, any such evidence would, under Rule 403, * * * if somehow marginally relevant, [be] * * * substantially outweighed by the clear danger of unfair prejudice, confusion and/or misleading the jury.

"The defendant's objections to these witnesses [(Jaime Galva and Rafael Acevedo)] is sustained. They shall not testify."

We deem this error and are hard-pressed to discern, on the basis of this ruling, the grounds upon which this testimony was "scarcely permissible, if at all * * * from the defendant's testimony." Simply put, defendant's grandfather, to whom the threat to kill was made, should have been permitted to testify as a defense witness about a specific act perpetrated by the decedent and conveyed to his grandson. We reject the state's argument that Jaime's anticipated testimony was not admissible as hearsay, or under Rule 404 of the Rhode Island Rules of Evidence,[18] or that it "would

---

[18] Rule 404(a)(2) of the Rhode Island Rules of Evidence, states:

"(a) *Character Evidence Generally.* Evidence of a person's character or a trait of the person's character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion, except:

have been cumulative" or that the exclusion of Jaime's testimony amounts to harmless error.

Although the trial justice did not exclude this evidence as hearsay, we briefly address the state's contention. Rule 801(c) of the Rhode Island Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." R.I. R. Evid. 801(c); *see also United States v. Bellinger*, 652 F. App'x 143, 147-48 (4th Cir. 2016). A statement "does not violate the hearsay rule [if] the statements and evidence are not offered to prove the truth of the matter asserted * * * but merely as a basis for the defendant's state of mind." *Tribble*, 428 A.2d at 1085 n.8. "A statement in which a decedent threatens a defendant charged with murder bears on the defendant's state of mind and is * * * relevant in determining whether a killing was second degree murder, manslaughter, or self-defense." *Bellinger*, 652 F. App'x at 147 (internal quotation marks and brackets omitted) (quoting *United*

---

"(2) *Character of Victim.* In cases in which the *defendant has raised self-defense*, *evidence of a pertinent trait of character of the victim of the crime* offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution to rebut evidence that the victim was the first aggressor[.]" (Emphasis added.)

- 30 -

*States v. Cline*, 570 F.2d 731, 734-35 (8th Cir. 1978)).  This testimony about such a threat is nonhearsay and is admissible.

The trial justice rejected this evidence on Rule 403 grounds as it "would undoubtedly lead to mini trials during the [s]tate's anticipated rebuttal * * *."  We disagree.  This is the defendant's trial.  The defendant is accused of murder and has raised the defense of self-defense.  The fact that the decedent repeated a threat to kill defendant to his grandfather three times just two weeks before this incident was clearly relevant to the defense of self-defense.  The trial justice's assessment that this evidence was marginally relevant is incorrect.  This is highly relevant proof in a self-defense case and not subject to exclusion as overly prejudicial where the defendant has asserted self-defense. *See Tribble*, 428 A.2d at 1085; *see, e.g.*, 2 John H. Wigmore, *Evidence in Trials at Common Law* § 247 at 54 (3d ed. 1940) ("*Defendant in Homicide: (b) Threats by the Deceased*[:] * * * [T]hreats of violence against the defendant, uttered by the deceased, and brought to the knowledge of the defendant, are relevant to show his belief of impending danger from the deceased."); *id.* at 58 ("[S]pecific threats of violence have a more decided bearing on the probability of aggression than mere dangerousness of character."); *McCormick's Handbook of the Law of Evidence* § 295 at 697, 700 (2d ed. 1972) ("*Declarations of Mental State: (b) Declarations of Intention Offered to Show Subsequent Acts of Declarant*[:] * * * Homicide and assault cases present another special problem.  If

- 31 -

the accused claims self-defense, and threats of the victim were known to the accused, these threats are admissible to prove the accused's apprehension of danger and its reasonableness.").[19]

We next turn to the state's contention that the exclusion of this proffered testimony was harmless error, and that "[e]ven if the trial court's ruling was in error, it does not amount to reversible error" because "[t]he improper exclusion of evidence * * * is reversible error only if the excluded evidence would have had a controlling influence * * *." (Quoting *State v. Burke*, 522 A.2d 725, 730 (R.I. 1987).) In *Burke*, this Court stated that it will "not mandate a new trial unless the preclusion of testimony causes substantial injury to the party seeking its admission," or in other words, "whether the rejected evidence reasonably could have altered the result." *Burke*, 522 A.2d at 730. Our careful review of this record leads us to conclude that evidence of a recent threat to kill defendant, made to his grandfather, qualifies as a controlling influence on a material aspect of the case—whether defendant acted in self-defense. Under the totality of the circumstances, we considered the following facts that were presented to the jury, and conclude that these facts would have influenced the jury's deliberations if Jaime was permitted to testify at trial: (1) a

---

[19] We need not reach the state's argument that this evidence was cumulative because the threat was made to Jaime, an eyewitness. The threat was relevant to defendant's state of mind during the incident because defendant testified that he was aware of the decedent's threat to kill him.

- 32 -

threat, indicating defendant was a dead man, was made to defendant's grandfather merely weeks before the incident; (2) the threat was made by an individual with whom defendant shared a confrontational past; and (3) the events that unfolded at the traffic light, where defendant consistently testified to being in fear of his life, hearing the decedent say, "I'm going to kill you. Come out the car. Stop the car."

As we have held, a defendant who posits the defense of self-defense "is entitled to present evidence that the victim had a reputation for being violent in order to show that the *defendant's fear of injury was reasonable* or to show that the victim was the aggressor." *In re J.S.*, 91 A.3d at 851 (emphasis added) (quoting *Cotty*, 899 A.2d at 494). This evidence is not limited to a reputation for violence. In *Ventre*, we held "that when self-defense is asserted, a defendant has a right to present not only reputation evidence but specific instances that tend to establish a victim's propensity for violence." *Ventre*, 811 A.2d at 1182. "This is particularly true when these instances of violence are known to defendant and would be relevant to determining his state of mind and whether he would be in fear of death or serious bodily harm." *Id.*

There is nothing in our caselaw that limits this evidence to the testimony of the accused, who, of course, is not required to testify. Eyewitnesses or victims of these acts of violence of which a defendant was aware may testify, subject to limitation within the discretion of the trial justice. *See Tribble*, 428 A.2d at 1085.

Following our holding in *Tribble*, the Court does not limit the evidence of specific acts of violence committed against third parties to be admissible only through the testimony of the defendant. *See id.* at 1083. Rather, *Tribble* is broader, observing that "evidence of such awareness may be highly relevant to the question of the reasonableness of the defendant's fear of imminent bodily injury at the hands of the victim." *Id.* Because a reasonable jury could have concluded that Jaime's testimony was a factor in deciding whether defendant's fear of injury was reasonable, thereby supporting defendant's claim of self-defense, its exclusion is reversible error.

### *2018 Pistol-Whipping Incident*

At trial, defendant testified about an incident that occurred in June 2018, which involved the decedent, the decedent's friend Sleither, and a firearm. According to defendant, the June 2018 incident involved an altercation with the decedent and Sleither, in which he was beaten by the decedent with a firearm.[20] The defendant argues on appeal that the trial justice erred in precluding the testimony from two eyewitnesses to the June 2018 pistol-whipping incident.

While defendant acknowledges that under *State v. Lomba*, 37 A.3d 615 (R.I. 2012), a court's decision to preclude testimony is left to the discretion of the trial

---

[20] The defendant also testified that his stepfather was struck with the pistol when he intervened. We note, of course, had defendant's stepfather—another alleged victim of the decedent's violence—been offered as a witness at trial, his testimony also would have been admissible.

justice, he asserts that the trial justice erred by excluding the testimony of Rafael Acevedo (Acevedo) and defendant's grandfather, both of whom witnessed the June 2018 pistol-whipping incident. *Lomba*, 37 A.3d at 621. The defendant further submits that the testimony of Acevedo and Jaime would have evidenced "a traumatic act of violence against [defendant]" and goes "directly to the jury's assessment of the reasonableness of [defendant's] actions on October 31, 2020," and that, therefore, such error warrants reversal. (Emphasis omitted.)

In determining whether the trial justice abused his discretion by excluding the testimony related to the 2018 pistol-whipping incident, we apply the same analysis addressed in our previous discussion regarding Jaime's anticipated testimony of the verbal threat. We begin with considering whether the trial justice's decision to exclude the 2018 pistol-whipping incident testimony was harmless error. *See Burke*, 522 A.2d at 730. As we have stated, this Court will "not mandate a new trial unless the preclusion of testimony causes substantial injury to the party seeking its admission." *Id.* Finally, we also consider whether the rejected evidence "could have altered the result." *Id.*

During the previously referenced in-chambers conference, the trial justice denied defendant's request to present Acevedo and Jaime because defendant testified to the incident and admitted that he never reported the 2018 pistol-whipping incident to the police, and that "[defendant] said more than once that he sustained a scar on

his forehead as a result of the pistol-whipping, and [the state's prosecutor] did not even attempt to broach that assertion." The trial justice explained:

> "THE COURT: * * * The defendant intends to present Rafael Acevedo and Jaime Galva in an effort to bolster the defendant's testimony regarding his state of mind relative to his self-defense claim at the time of the [October 31, 2020] incident. The [s]tate will then understandably expect to be allowed to counter much of that evidence and turn the defense state of mind testimony through these witnesses into a mini trial of events which preceded the October 31st, 2020 shooting * * *. I will not permit that.
>
> "* * *
>
> "THE COURT: * * * I'm not about to permit others to take the stand and recite more of what was scarcely permissible, if at all, the first time, from the defendant's testimony. It would in any event, be entirely inappropriate even if the evidence which defense counsel now seeks to be admitted were marginally relevant. * * * It should be disallowed as it would undoubtedly lead to mini trials during the [s]tate's anticipated rebuttal * * *."

Thereafter, the trial justice precluded this evidence on Rule 403 grounds. Although we deem this ruling an abuse of discretion, and declare that this evidence is admissible on remand, we are satisfied that in the context of this case, its omission was harmless error. The record discloses that the trial justice failed to consider that the state conceded to defendant testifying, under Rule 404(b), arguing that Esdel could testify about the 2018 pistol-whipping incident "because it is directly relevant to his * * * subjective reasonable fear on the night in question." Based on the state's

- 36 -

concession, and in light of our discussion of *Tribble* herein, it is our view that the testimony of these eyewitnesses to the 2018 pistol-whipping altercation was admissible, subject to limitation by the trial justice. Again, evidence of acts of violence by the decedent perpetrated upon defendant is highly relevant on the issue of self-defense, and we fail to see that the possibility of rebuttal by the state substantially outweighs its probative force.

In *State v. Sinapi*, 295 A.3d 787 (R.I. 2023), we held that "[h]armless error is recognized to be an error that in the setting of a particular case is so unimportant and insignificant that it may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Sinapi*, 295 A.3d at 809 (brackets omitted) (quoting *State v. Terzian*, 162 A.3d 1230, 1244 (R.I. 2017)).

We therefore conclude that the exclusion of these witnesses does not carry that same "controlling influence" set forth in *Burke*. *See Burke*, 522 A.2d at 730. As this Court stated in *Lomba*, the decision to preclude testimony is left to the discretion of the trial justice. *Lomba*, 37 A.3d at 621. After carefully reviewing the record, we are of the opinion that this evidence is admissible, but its exclusion in the context of this case amounts to harmless error.

## The WhatsApp Video

"Reliability is the linchpin of the law of evidence." *State v. Mulcahey*, 219 A.3d 735, 739 (R.I. 2019). Pursuant to Rule 901 of the Rhode Island Rules of Evidence, authentication "is a threshold requirement to establishing the reliability of a matter of evidence." *Id.* Rule 901(a) provides in part:

> "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." R.I. R. Evid. 901(a).

We note at the outset that "[t]he burden of proof for authentication, however, is slight." *Mulcahey*, 219 A.3d at 739 (quoting *State v. Adams*, 161 A.3d 1182, 1199 (R.I. 2017)). Moreover, we have further held that it is the trial justice who "must decide whether there is enough support in the record to conclude that it is 'reasonably probable' that the evidence is what its offeror proclaims it to be." *Id.* (quoting *Adams*, 161 A.3d at 1199). "If so, then the evidence's persuasive force is for the jury to decide." *Id.* (brackets omitted) (quoting *Adams*, 161 A.3d at 1199). Therefore "a trial justice need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the jury ultimately *might* do so." *Id.* (emphasis added) (quoting *Adams*, 161 A.3d at 1199).

This Court has had limited occasions to address issues of authenticity in the context of various electronic communication platforms. In *O'Connor v. Newport*

*Hospital*, 111 A.3d 317 (R.I. 2015), we addressed, *inter alia*, the issue of authentication with respect to a printed copy of an e-mail communication. *See O'Connor*, 111 A.3d at 323. More recently, we confronted the issue of the authenticity of a text message in *Mulcahey*, and we acknowledged the "fundamental difference between text messages, which generally are sent to one person known to the sender, and an e-mail." *Mulcahey*, 219 A.3d at 740. At the time *Mulcahey* was decided, the issue of authenticating a text message was a matter of first impression and we noted that "Rhode Island [R]ule [901] mirrors the federal rule * * *." *Id.* at 739, 740. Accordingly, we turned to federal caselaw for guidance. *Id.* at 740.

For example, we noted that *United States v. Davis*, 918 F.3d 397 (4th Cir. 2019), "addressed the use of text messages and held that authentication of text message evidence under Rule 901 of the Federal Rules of Evidence requires 'only a prima facie showing that the true author is who the proponent claims it to be.'" *Mulcahey*, 219 A.3d at 740 (quoting *Davis*, 918 F.3d at 402). We further noted that "the prima facie showing may be accomplished largely by offering circumstantial evidence that the documents in question are what they purport to be." *Id.* (quoting *Davis*, 918 F.3d at 402).

The issue before us concerns communications and observations of a social media post, a video, which was posted on the social media/electronic communication

platform known as "WhatsApp."[21]  The WhatsApp video was retrieved by the state and disclosed to the defense when it requested the decedent's telephone records. Although our caselaw does not directly align with the WhatsApp social media platform, we are satisfied that the characteristics of a WhatsApp video closely resemble that of a text message, rather than a printed copy of an e-mail or the e-mail itself. *See Mulcahey*, 219 A.3d at 740; *Cf. O'Connor*, 111 A.3d at 322-25. Accordingly, we look to *Mulcahey* for guidance on the issue of authentication concerning the WhatsApp video. *See Mulcahey*, 219 A.3d at 739-40.

At trial, it was argued that the WhatsApp video in question places a gun in the decedent's hand on the day he died.  Wilka Rosario (Wilka)—who considered the decedent "like a brother"—testified and gave conflicting testimony.  She was not present at the scene of the shooting, but testified to the events leading up to the moment she received a phone call reporting that the decedent had been shot.  She recited that earlier in the evening on the night the decedent was killed, she threw a surprise birthday party for the decedent.  The birthday party began around "7:10, 7:15 or so[,]" and ended around 9:45 p.m.  At approximately 10:40 p.m., Wilka

---

[21] It is our understanding that "WhatsApp started as an alternative to [Short Message/Messaging Service (SMS)].  [WhatsApp] now supports sending and receiving a variety of media: text, photos, videos, documents, and location, as well as voice calls." *See* WhatsApp, *About Us*, https://www.whatsapp.com/about (last visited July 9, 2024).

received a call from Jeremy, who told her that the decedent had been shot and that they were headed to the hospital.

The defendant argues to this Court that, on questioning by the trial justice outside the presence of the jury, the authenticity of the WhatsApp video was acknowledged by Wilka, who had "seen a video" of the decedent brandishing a gun on a WhatsApp video, but vaguely asserted that this was "[a] couple days before" the shooting and that "[i]t wasn't the day of the party at all."[22] She also provided a detailed description of the decedent waving a gun around in the video, thus identifying the decedent "singing a song, the lyrics to the rap." This was the only time Wilka observed a video of the decedent brandishing a firearm which she testified as having been taken at the decedent's home.[23]

---

[22] Prior to the sidebar that ensued, Wilka confirmed her telephone number during cross-examination and further represented that she did not give that telephone, with that telephone number, to anyone else on the night of October 31, 2020. Wilka later testified that the telephone number which she confirmed belonged to her was the same telephone number associated with her WhatsApp account.

[23] During voir dire, Wilka testified that the video, which was posted as a status, "stays 24 hours, and if you decide to delete it you can delete it, but the most it stays * * * is 24 hours." Wilka further testified that she did not watch the entire video because "like, Snapchat [(another social media platform)], you can record minutes or just a couple of seconds * * * or you just swipe off and go to the next person."

Significantly, this disclosure was made after Wilka denied seeing the video on cross-examination and after counsel's offer of proof, which led to a voir dire examination by the trial justice. The defendant's offer of proof provided:

> "[DEFENSE COUNSEL]: * * * Our expert who reviewed the phone data extraction can show that [Wilka] received two messages on that evening that had [the decedent] brandishing firearms. *She received them.* I have the times, and she received them at that telephone number." (Emphasis added.)

The record also reflects that there were other videos extracted from the decedent's cellphone the day he was killed that were admitted into evidence and, according to defendant, "were precisely as they purported to be on the extraction of the decedent Rosario's time-stamped phone" that was produced by the state. In addition to Wilka's testimony, defense counsel urged the trial justice to allow the state's witness, Jonathan Galva (Jonathan) to be cross-examined about "a recorded interview where [Jonathan] expressly states he viewed, on the night in question * * * a video that [the decedent] sent to him brandishing a firearm, singing and rapping." The court responded with, "what does that have to do with seeing some video that you cannot establish by way of authentication? You don't know when it was taken, you don't know if it was received, and you don't even [know] who sent it." Defense counsel argued that he could prove that the WhatsApp video was sent by the decedent to Jonathan, and further prove that Jonathan read the message, viewed the

video, and admitted during a recorded interview to viewing the WhatsApp video. The trial justice was not persuaded by defense counsel's argument and excluded this evidence, stating, "What does [the video] have to do with seeing weapons on the street during the event in question?  Some video taken God knows when."[24]

During trial, a sidebar commenced, and the court revisited the admissibility issue concerning the WhatsApp video.  Based on defendant's testimony—he testified on both direct and cross-examination that he observed the decedent with a firearm on the evening of the incident—defense counsel submitted that the WhatsApp video was admissible as it was relevant for the jury to consider whether the decedent possessed a firearm on the evening of the incident and establish the decedent's state of mind at the moment the decedent set upon defendant.  The state conceded that "*defendant* is allowed to testify about the specific acts of the victim relative to a state of mind on the night in question" and that it is relevant in relation to the issue of self-defense. (Emphasis added.)  However, the state nonetheless maintained that because defendant did not testify that "he saw [the WhatsApp video], [or] what platform he saw [this] video[] on," or what was depicted in that video, defendant's testimony "was not * * * close to what is necessary to get in [the WhatsApp video] * * *."

---

[24] When the video was produced is not determinative on the question of authenticity; the relevant factor is when the video was published.  If it was published at or close to the date of the incident, it is admissible.

The trial justice determined that defendant's testimony did not elicit a sufficient basis to authenticate the WhatsApp video under Rule 901. He concluded that the WhatsApp video was inadmissible, stating:

> "[The defendant] could have gotten on the stand and spoken about it; he did not. We don't know when these videos were taken. We don't know who took them. We don't know if they can even be authenticated. We don't even know where they were taken.
>
> "Regarding Wilka * * * she said she might have seen it two days before. We don't know if [the WhatsApp video was] altered. [Wilka] didn't even know if [the decedent] had a real gun * * * or a toy gun. * * * Beyond that, she did not have any other good information relative to the [WhatsApp] video."

We recognize that the evidence as to authenticity in the case at bar is distinguishable from the facts presented in *Mulcahey*. *See Mulcahey*, 219 A.3d at 739-41. In *Mulcahey*, the victim "testified that defendant personally provided her with his cell phone number about a year before the assault"; that the victim and defendant had exchanged multiple text messages prior to the date of the assault; and that the text that was produced at trial was apologetic in nature, and sent within hours of the assault. *Id.* at 741. Under those circumstances, we concluded that "sufficient circumstantial evidence [established] that the defendant authored the text messages." *Id.* Here, by contrast, there is insufficient testimony in the record indicating that either party properly laid a foundation to authenticate the WhatsApp video. Clearly,

- 44 -

a video of the decedent brandishing a firearm on or close to the date he was killed is highly relevant to whether the decedent had a firearm on the night in question. Given the significance of this evidence to both sides in this case, it must be authenticated to be deemed admissible.

Having carefully reviewed the record before us, we are of the opinion that, if properly authenticated as to having been published by the decedent within a reasonable time before the shooting, the video should be admissible on remand because it potentially can serve as circumstantial evidence that the decedent was armed on the night of the incident. The defendant shall be afforded a full opportunity to present evidence, including expert witness testimony, if necessary, to establish the authenticity of the video.

## Conclusion

For the reasons stated herein, we hold that there was sufficient evidence from which a jury could have found the defendant guilty of the lesser-included offense of voluntary manslaughter and that the trial justice committed reversible error in refusing to so instruct. We further conclude that the trial justice abused his discretion by precluding the testimony of Jaime Galva at trial. We deem the trial justice's decision to exclude witnesses from testifying about the 2018 pistol-whipping incident as harmless error, and we direct that the issue of the authenticity of the WhatsApp video be fully litigated in advance of the new trial.

Accordingly, we vacate the judgment of the Superior Court. The record in this case is remanded to the Superior Court for a new trial on the charge of second-degree murder and the lesser-included offense of manslaughter.



**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | State v. Jairo Esdel. |
| **Case Number** | No. 2022-304-C.A.<br>(P1/20-3310AG) |
| **Date Opinion Filed** | July 15, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Sean Paul Malloy<br>Department of Attorney General |
| | For Defendant:<br><br>Aaron L. Weisman, Esq. |